UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE

2005 FEB 14  P 4:42

U.S. DISTRICT COURT
DISTRICT OF MASS.

UNITED STATES OF AMERICA )
)
v. ) CRIMINAL NO. 04-cr-10066-MEL
)
JAMIE EDELKIND, )
)
       defendant. )

## UNITED STATES' TRIAL MEMORANDUM

The United States of America, by its undersigned counsel, submits this memorandum in order to advise the Court and defense counsel regarding anticipated evidence at trail.

### OFFENSES CHARGED

Defendant Jamie Edelkind is charged with four counts of Bank Fraud in violation of Title 18, United States Code, Section 1344. The Information also contains a criminal forfeiture allegation seeking forfeiture of both real property and a bank account as proceeds of Edelkind's crimes.

The Bank Fraud scheme at issue in this case is relatively simple: Edelkind, who was in bankruptcy at the time, used his wife, Linda Edelkind (nee Linda Lien), as the nominal borrower/buyer to acquire a mansion in Hull, Massachusetts. In actuality, Linda Edelkind was no more credit worthy than her husband, being a homemaker with no significant source of outside income. To disguise the fact that Linda Edelkind was not creditworthy, Defendant concocted a variety of bogus financial records, including forged Federal tax returns (IRS Form 1040), wage reports (IRS Form W-2), and paycheck "stubs," which purported to show Linda Edelkind earning an annual salary well over $200,000 per year.

Having initially acquired the Hull property by fraud, Edelkind subsequently arranged a series of "roll-over" transactions, using the appraised value of the residence to support ever larger loans, including both "home equity" loans for a few hundred-thousand dollars and refinances for the total outstanding amounts borrowed against the residence.

In the fall of 2004, the house of cards collapsed, as Edelkind began serving a federal prison term for frauds he had previously committed in the District of Georgia. With one last refinancing, Edelkind arranged with his wife Linda to take the bulk of the excess-cash proceeds out of the country to Norway (Linda is a Norwegian national) and then to abandon the loan.

## ELEMENTS OF THE OFFENSE

### Bank Fraud

The bank fraud statute (18 U.S.C. § 1344) provides, in relevant part:

> Whoever knowingly executes, or attempts to execute, a scheme or artifice
>
> (1) to defraud a financial institution; or
>
> (2) to obtain any of the moneys, funds, credits, assets, securities or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises [shall be guilty of a felony]

The elements of this offense are:

1. Defendant executed or attempted to execute;

2. A scheme to defraud a federal financial institution, or to obtain money from a financial institution by false or fraudulent pretenses, representations or promises;

3. the scheme involved material falsehoods; and

4. The defendant acted knowingly; and

        5.       The financial institution was covered by the definition of that term in Title 18, United States Code, Section either federally chartered or insured.

See United States v. Kenrick, 221 F.3d 19, 30 (1st Cir. 2000); United States v. Brandon, 17 F.3d 409, 424 (1st Cir. 1994). See also Neder v. United States, 527 U.S. 1, 25 (1999) ("[M]ateriality of falsehood is an element of the federal mail fraud, wire fraud, and bank fraud statutes.").

Under Section 1344, the terms "scheme" and "artifice" include "any plan, pattern or c[our]se of action, including false and fraudulent pretenses and misrepresentations, intended to deceive others in order to obtain something of value, such as money, from the institution to be deceived." United States v. Goldblatt, 813 F.2d 619, 624 (3rd Cir. 1987); accord United States v. Cloud, 872 F.2d 846, 850 (9th Cir. 1989), cert. denied, 493 U.S. 1002 (1989).

There is no single definition of a scheme to defraud. As the First Circuit has noted:

> "The term 'scheme to defraud' . . . is not capable of precise definition. Fraud instead is measured in a particular case by determining whether the scheme demonstrated a departure from fundamental honesty, moral uprightness, or fair play and candid dealings in the general life of the community."

Brandon, 17 F.3d at 424 (quoting United States v. Goldblatt, 813 F.2d 619, 624 (3d Cir. 1987)).

The intent to defraud that is required for a violation of Section 1344 "is an intent to deceive the bank in order to obtain from it money or other property." Kenrick, 221 F.3d at 30. Such fraudulent intent may be proved by circumstantial evidence, and may be established by inference from the evidence of the scheme itself. Brandon, 17 F.3d at 425 (citing United States v. Cloud, 872 F.2d 846, 852 n.6 (9th Cir. 1989)). See also United States v. Mason, 902 F.2d 1434, 1442 (9th Cir.1990) ("Specific intent is established by 'the existence of a scheme which was reasonably calculated to deceive persons of ordinary prudence and comprehension, and this

3

intention is shown by examining the scheme itself.'") (citation and internal quotation omitted), quoted in Brandon, 17 F.3d at 425.

The United States is <u>not</u> required to prove that the defendant intended to harm any financial institution or that any financial institution suffered a loss as a result of defendant's actions.[1] As the First Circuit has ruled, "the intent element of bank fraud under either subsection [of 18 U.S.C. §1344] is an intent to deceive the bank in order to obtain from it money or other property." United States v. Kenrick, 221 F.3d 19, 29 (1st Cir. 2000). Specifically, the Court noted, "'Intent to harm' is not required." Id.

While the government must prove beyond a reasonable doubt that the defendant acted with intent to defraud, the government is <u>not</u> required to prove that the defendant knew that the lenders were federally insured. As the First Circuit has noted, "The status of the victim-institution is not a separate knowledge element of bank fraud under § 1344 but an objective fact that must be established in order for the statute to apply." Brandon, 17 F.3d at 425 (rejecting defendant's contention "that the government must prove that they knew that the victim of their fraud was a federally insured financial institution").

Nor is the government required to prove that the defendant knew <u>which</u> bank he was defrauding. The fact that bank loans – including the loans at issue in this case – are commonly procured through a non-bank loan originator and then sold to the ultimate lender does not diminish a defendant's culpability for fraud. See Brandon, 17 F.3d at 426 (holding that " it is . . . unnecessary for the government to prove that a defendant knows which particular bank will be

---

[1] Accordingly, it is no defense to contend that the defendant believed that value of the collateral posted for a fraudulently obtained loan would be sufficient to protect the lenders against any ultimate loss.

4

victimized by his fraud as long as it is established that a defendant knows that a financial institution will be defrauded.").

### Aiding and Abetting Liability

The aiding and abetting statute defines the crime of aiding and abetting as follows:

(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

18 U.S.C. §2.

The mere fact that the fraudulently obtained loans were in the name of Defendant's wife has no direct bearing on his criminal responsibility. Whether Edelkind or his wife was the leader of the scheme, they are both fully culpable, as principles, provided that they participated in committing the offense and acted with the requisite criminal intent. "In order to convict a defendant of aiding and abetting, the government must prove that the defendant in some way associated himself with the fraudulent scheme and that he shared the criminal intent of the principal." United States v. Serrano, 870 F.2d 1, 6 (1st Cir.1989) (emphasis added) (citation omitted).

### Forfeiture

The applicable statute provides that the following property is subject to forfeiture to the United States:

Any property, real or personal, which constitutes or is derived from proceeds traceable to ... any offense constituting "specified unlawful activity" (as defined in section 1956(c)(7) of this title) ...

18 U.S.C. § 981(a)(1) (Civil Forfeiture); 28 U.S.C. § 2461(c) (the Government may bring a criminal forfeiture action whenever a defendant is convicted of an offense for which any form of forfeiture – civil or criminal – is authorized). 18 U.S.C. § 1956(c)(7)(A) defines "specified unlawful activity" as including "any act or activity constituting an offense" listed in 18 U.S.C. § 1961(1), except for certain violations of Title 31. Bank fraud (18 U.S.C. § 1344) is an offense listed in 18 U.S.C. § 1961(1)(B).

Pursuant to Fed. R. Crim. P. 32.2(b), the court must conduct a proceeding to determine the forfeitability of the property "as soon as practicable" after the court enters a guilty verdict. Fed. R. Crim. P. 32.2(b)(1). Generally, the forfeitability of the property is determined by the court, but in cases where the guilty verdict was returned by a jury, the defendant has the right to ask that the jury be retained to make the forfeitability determination. Fed. R. Crim. P. 32.2(b)(4); United States v. Davis, 177 F. Supp. 2d 470 (E.D. Va. 2001) (under Rule 32.2(b)(4), defendant must make a specific request to have the jury retained to determine the forfeiture).

The burden of proof regarding forfeitability of property in a criminal case is preponderance of the evidence. Libretti v. United States, 516 U.S. 29, 49 (1995) (forfeiture is part of the sentencing phase of a criminal case, and a defendant accordingly has no Sixth Amendment right to have the jury determine the forfeitability of his property); United States v. Rogers, 102 F.3d 641, 648 (1st Cir. 1996) (burden of proof in section 853 cases is preponderance of the evidence because criminal forfeiture is part of the sentence under Libretti). Apprendi v. New Jersey, 530 U.S. 466 (2000) does not apply to the forfeiture phase of a criminal trial. United States v. Keene, 341 F.3d 78, (1st Cir. 2003). "The forfeiture is not viewed as a separate charge, but as an aspect of punishment imposed following conviction of a substantive offense."

Id. at 85-86 (internal quotations and citations omitted). Thus, the preponderance of the evidence standard applies. Id. at 86.

The jury must find whether there is a nexus between the property that the government asserts constitutes or is derived from proceeds traceable to each bank fraud violation of which it finds the defendant guilty. The jury must not consider what happens to any property that is declared forfeited, nor should it consider any claims that other persons may have to the property. The interests that other persons may have in the property will be taken into account by the court at a later time. Similarly, any claims that the forfeiture of the property would constitute excessive punishment will be taken into account by the court at a later time.

## ANTICIPATED EVIDENCE

### Testimony

The United States anticipates calling loan originators and other lending institution personnel to describe their dealings with Jamie Edelkind in connection with the preparation and submission of loan applications. In addition, to the extent necessary, keepers of records will authenticate the documentary evidence to be offered by the United States.

The United States anticipates calling an Investigative Analyst from the Internal Revenue Service to explain the IRS's record-keeping procedures and the processes used to establish the absence of a particular tax record or filing. The IRS keeper of records will also describe the computerized storage format used for certain tax return information and explain how to read the print-outs from the computerized records.

The United States anticipates calling Richard O'Connor, an accountant for Jamie and/or Linda Edelkind. To date, O'Connor has declined to respond to a subpoena for records, claiming attorney-client privilege and asserting that he was engaged by an attorney for the purpose of

providing legal services. It appears that the assertion of attorney-client privilege in this instance is patently over-broad, at best. Nevertheless, the prosecution is compelled to bring the matter to the Court's doorstep, rather than risk intruding on any communications that may in fact be privileged. See United States v. Edgar, 82 F.3d 499, *508 (1st Cir. 1996) ("Ideally, a prosecutor faced with an assertion of privilege by an attorney witness will seek a judicial determination of whether the privilege is valid."). Accordingly, the United States also has issued a trial subpoena to Philip K. Gordon, Esq., the attorney who allegedly engaged O'Connor on behalf of the Edelkinds, and who has instructed O'Connor not to respond to any subpoenas. While it may be that some portion of the accountant's work properly related to the furnishing of legal advice, it is axiomatic that communications made for the purpose of conveying information to third parties are not confidential and are not within the scope of the attorney-client privilege. In particular, communications even directly between attorney and client concerning how items or transactions should be reported on a tax return are not protected by privilege.

> The Seventh Circuit has summarized the operative principles as follows:
>
> There is no common law accountant's or tax preparer's privilege, Couch v. United States, 409 U.S. 322, 335, 93 S.Ct. 611, 34 L.Ed.2d 548 (1973); United States v. Arthur Young & Co., 465 U.S. 805, 817-19, 104 S.Ct. 1495, 79 L.Ed.2d 826 (1984), and a taxpayer must not be allowed, by hiring a lawyer to do the work that an accountant, or other tax preparer, or the taxpayer himself or herself, normally would do, to obtain greater protection from government investigators than a taxpayer who did not use a lawyer as his tax preparer would be entitled to. United States v. Lawless, 709 F.2d 485, 487-88 (7th Cir.1983); United States v. Bornstein, 977 F.2d 112, 116-17 (4th Cir.1992); In re Grand Jury Investigation, 842 F.2d 1223, 1224-25 (11th Cir.1987); United States v. Davis, 636 F.2d 1028, 1043 (5th Cir.1981). To rule otherwise would be to impede tax investigations, reward lawyers for doing nonlawyers' work, and create a privileged position for lawyers in competition with other tax preparers--and to do all this without promoting the legitimate aims of the attorney-client and work-product privileges.

\* \* \*

> Communications from a client that neither reflect the lawyer's thinking nor are made for the purpose of eliciting the lawyer's professional advice or other legal assistance are not privileged. The information that a person furnishes the preparer of his tax return is furnished for the purpose of enabling the preparation of the return, not the preparation of a brief or an opinion letter. Such information therefore is not privileged.

United States v. Frederick, 182 F.3d 496, 499-500 (7th Cir. 1999).

Specifically, the United States anticipates inquiring about the accountant's role in preparing tax returns for Linda Edelkind that purported to show extremely large wage and salary income for the years 2001 and 2002, followed by a return for 2003 which purported to show a "bad-debt" loss equal to the entire amount of the wage and salary income reported for the two prior years. Whatever these submissions might mean for tax purposes, it appears that – taken together – the returns show that Linda Edelkind did not actually receive any wage or salary income for the tax years 2001 and 2002.

The United States also anticipates calling George Aiken to testify regarding his dealings with Jamie Edelkind in connection with Apostille – the company from which the Edelkinds claimed Linda Edelkind was earning in excess of $200,000 a year. George Aiken will testify that, to his knowledge, Apostille never made any money. The United States anticipates calling Deborah Aiken, George Aiken's wife, to testify that, to her knowledge, Linda Edelkind was a stay at home mother who did not work outside the home.

### EXHIBITS

The United States anticipates introducing documentary and real evidence, as follows:

1.  **Plea Agreement in Georgia Prosecution**

As part of his plea agreement with the United States Attorney's Office for the Northern District of Georgia, Edelkind signed an agreement which includes express admissions about his

9

guilt on the charges in this case [with the exception of Count 4 of the present Information, which arises from conduct occurring <u>after</u> Edelkind's guilty plea in Georgia].

As part of, and in conjunction with, the United States Attorney for the Northern District of Georgia's agreement not to treat Edelkind's conduct in Massachusetts as "relevant conduct" for purposes of sentencing on the charges in the Northern District of Georgia, Edelkind provided the following admission:

> The defendant acknowledges and admits his guilt as to the charges currently contained in Criminal Information 04-CR-10066 in that case in Massachusetts.

Guilty Plea and Plea Agreement, Criminal No. 1:03-CR-364-CAP (N.D. Ga. signed May 6, 2004).

This statement by defendant is admissible pursuant to Rule 801(d)(2)(A) (admission by party-opponent not hearsay). Its introduction in evidence is not barred by Fed. R. Crim. P. 11(f) or Fed. R. Evid. 410, since it was not "made in the course of plea discussions with an attorney for the prosecuting authority which do not result in a plea of guilty or which result in a plea of guilty later withdrawn" (Fed. R. Evid. 410(4)). See <u>United States v. Watkins</u>, 85 F.3d 498, 500 (10th Cir. 1996) ("[B]oth the language of, and the policy underlying, Rule 11(e)(6)(D) verify that once a plea agreement is reached, statements made thereafter are not entitled to the exclusionary protection of the Rule. . . . Because the statements of Watkins at issue here were made after the plea agreement had already been finalized, they are not entitled to Rule 11(e)(6)(D)'s exclusionary protection.") (citations omitted); <u>United States v. Knight</u>, 867 F.2d 1285 (11th Cir.1989) ("Once a plea contract is formed, the policy behind Rule 11(e)(6)--to allow a defendant to freely negotiate without fear that statements will be used against him--is no longer applicable.") (citing <u>United States v. Davis</u>, 617 F.2d 677 (D.C.Cir.1979); and <u>United States v.</u>

10

Stirling, 571 F.2d 708 (2d Cir.1978)).  See generally Hutto v. Ross, 429 U.S. 28, 30 (1976). ("We conclude that the Court of Appeals erred when it held that any statement made as a result of a plea bargain is inadmissible.").

To make clear which charges were included in the Information that was pending at the time of defendant's admission, it will be necessary to offer a copy of that Information in evidence as well.

The remainder of the Edelkind's Georgia plea agreement (i.e., the portions that do not relate to this case), may raise significant concerns under Fed. R. Evid. 404(b) and 403. Counsel for the United States anticipates working with Edelkind's counsel to determine if the parties can agree upon appropriate redactions. The United States notes, however, that the fact of defendant's prior conviction of some crime will almost inevitably come before the jury, due to the offering in evidence of recordings of certain telephone conversations by the defendant, which were recorded on a federal prison telephone monitoring system.

2. Recorded Conversations

The United States has recently obtained copies of recorded telephone conversations between Defendant and others, including Defendant's wife, Linda Edelkind. Copies of these recordings have been provided to Defendant's counsel. The United States is in the process of selecting/excerpting conversations that are relevant to the charges in this case.

The United States notes that, based upon the contents of the telephone conversations and upon the other evidence in this case, it appears that Linda Edelkind conspired with Defendant to commit offenses against the United States, including Bank Fraud and monetary transactions with proceeds of specified unlawful activity. Accordingly, statements of Linda Edelkind are admissible against Defendant pursuant to Fed. R. Evid. 801(d)(2)(E).

3.   Bank Loan Files

The United States will offer the bank loan files for the loans that are identified in Counts 1-4, as well as certain bank loan files reflecting Edelkind's other attempts to finance (or refinance) the Hull residence. The United States anticipates offering keeper of record certificates, pursuant to Fed. R. Evid. 902(11), to authenticate these documents and establish that they are business records within the scope of Fed. R. Evid. 803(6).

4.   Bank Transaction Records

The United States will offer bank transaction records reflecting the deposit of the excess loan proceeds of the final refinancing of the Hull residence in the fall of 2004 into Linda Edelkind's bank account, as well as the withdrawal and overseas transmittal of those funds.

The United States also will offer bank transaction records, together with real estate records, to establish the falsity of putative "rent checks" that were submitted to a lender in order verify Linda Edelkind's prior residence and housing costs.

The United States anticipates offering keeper of record certificates, pursuant to Fed. R. Evid. 902(11), to authenticate these documents and establish that they are business records within the scope of Fed. R. Evid. 803(6).

5.   Shipping Records

The United States anticipates offering records reflecting the shipment of Linda Edelkind's household goods overseas, roughly contemporaneously with her transmittal of loan proceeds overseas and with defendant's telephonic instruction to her not to pay the mortgage on the Hull residence. The United States anticipates offering keeper of record certificates, pursuant to Fed. R. Evid. 902(11), to authenticate these documents and establish that they are business records within the scope of Fed. R. Evid. 803(6).

12

6.  <u>Absence of Federal Tax Returns</u>

The United States anticipates offering a certification, pursuant to Fed. R. Evid. 803(10) and 902, regarding the absence of tax return filings for entities which were represented – in submissions to lending institutions – to have provided "W-2's" reflecting income to Linda Edelkind.

7.  <u>Tax Return Records</u>

The United States anticipates offering tax return information reflecting filings by, or on behalf of, Linda Edelkind, which reflect that Linda Edelkind did not actually receive the income represented in her loan applications to the various lenders who financed, or re-financed, the Hull residence.

8.  <u>Bank Insurance Certificates</u>

To satisfy the jurisdictional prerequisite for the bank fraud charges, the United States anticipates offering FDIC certificates reflecting the insured status of the lending institutions at issue in this case. Such documents are ordinarily under seal and self-authenticating.

9.  <u>Airline Records</u>

The United States anticipates offering Lufthansa German airline records to establish that Linda Edelkind, along with the Edelkinds' three children, fled to Norway after the final mortgage closing. The United States anticipates offering keeper of record certificates, pursuant to Fed. R. Evid. 902(11), to authenticate these documents and establish that they are business records within the scope of Fed. R. Evid. 803(6).

10. <u>Trinet Records and Absence of Records</u>

The United States anticipates offering a certification, pursuant to Fed. R. Evid. 803(7) and 902(11), that Trinet has no record corresponding to a Form W-2 for Linda Edelkind,

13

purportedly issued by Trinet on behalf of Apostille, that was submitted in support of one of the loans at issue in this case. The United States also anticipates offering records reflecting that OneBig CD, a former employer of Defendant, used Trinet's payroll services and issued at least one Form W-2 to Defendant when he was employed by OneBig CD. The United States anticipates offering keeper of record certificates, pursuant to Fed. R. Evid. 902(11), to authenticate these documents and establish that they are business records within the scope of Fed. R. Evid. 803(6).

11.     Documents Regarding Apostille

The United States anticipates offering certified copies of the Delaware Certificate of Incorporation for Apostille, as well as a business plan for Apostille prepared, in part, by George Aiken.

12.     Bankruptcy Records

The United States anticipates offering records from the United States Bankruptcy Court for the Northern District of Georgia reflecting that Jamie Edelkind filed for bankruptcy in 1991 and 1999, and that his second bankruptcy petition was pending from October 21, 1999 through October 2003.

TRIAL ISSUES

1.     404(b) Evidence

The United States has notified Defendant that it anticipates offering the following evidence regarding Defendant's ongoing execution of, and attempt to execute, his scheme to defraud banks and other institutions, as described in the Superceding Information, and/or pursuant to Fed. R. Evid. 404(b), for purposes of proving motive, opportunity, intent, preparation, plan, knowledge, identity and absence of mistake or accident.

On or about November 24, 1998, Defendant obtained a $221,000 "equity take out" loan on the real property known as Unit 122, Paces Run, Cobb County, Georgia (the "Paces Run Property"), from First Union National Bank. At the time, the Paces Run Property had an appraised value of $262,000. When Defendant executed a deed to secure debt in favor of First Union National Bank on the Paces Run Property, he did not disclose to First Union National Bank that he had already taken "equity" out of the Paces Run Property, or that the Paces Run Property was encumbered by deeds to secure debt that he had given, totaling $260,000 to secure other loans. Defendant further did not disclose that he had little, if any, remaining "equity" to take out of the Paces Run Property. In May 2004, Defendant pleaded guilty in the Northern District of Georgia to one count of Bank Fraud, in violation of 18 U.S.C. § 1344, in connection with this "equity take out" loan.

In or around May 1999, Defendant submitted a loan application to Mortgage Brokers Inc., for a loan in the amount of $1,650,000 in connection with his offer to purchase real property located at 591 West Paces Ferry Road in Atlanta, Georgia. The loan application contained false information regarding the employment and income of Defendant and his wife. In addition, Defendant submitted forged and fraudulent documents to support his income claims, including without limitation forged and fraudulent Forms W-2 and 1040 in his name.

In or around June 2004, Defendant submitted a mortgage loan application, signed by Linda Edelkind, to WCS Financial Services. That loan application falsely represented that Linda Edelkind had been employed by Apostille Inc. for five years, and that she had been employed in the same line of work for eleven years.

In or around January 2004, Defendant submitted a mortgage loan application, signed by Linda Edelkind, to Sunset Mortgage in Auburn, Massachusetts. That application falsely listed

15

Linda Edelkind's income as approximately $35,000 per month from employment at Apostille Inc. In support of that application, Defendant submitted two false pay statements purporting to reflect payments to Linda Edelkind from Apostille Inc.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

Dated: February 14, 2005

By: _____
KRISTINA E. BARCLAY
PAUL G. LEVENSON
Assistant U.S. Attorney
John Joseph Moakley United States Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3147

CERTIFICATE OF SERVICE

I hereby certify that on this day I will cause a true copy of the above document to be served by hand upon counsel of record for defendant, addressed as follows:

Robert L. Sheketoff, Esq.
One McKinley Square
Boston, MA 02109

February 14, 2005

_____
KRISTINA E. BARCLAY

16