UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | )<br>)<br>)<br>) CRIMINAL NO. |
| v. | ) 04 − 10066 MEL<br>) |
| JAMIE EDELKIND | )<br>) |

**DEFENDANT JAMIE EDELKIND'S SECOND RENEWED MOTION FOR JUDGMENT OF ACQUITTAL WITH RESPECT TO COUNT FOUR OF THE SECOND SUPERSEDING INFORMATION**

On March 8, 2005 a jury returned guilty verdicts against the defendant Jamie Edelkind ("Edelkind") on all four counts of the Second Superseding Information. Each of the counts had charged bank fraud in violation of 18 U.S.C. § 1344. An essential, if not jurisdictional, element of a violation of this statute is proof of a fraud upon a "financial institution" as defined in 18 U.S.C. § 20. For purposes of this case at least, this means the government was required to prove fraud upon a federally insured financial institution.

With respect to Count Four of the Second Superseding Information, the government introduced, without objection, Exhibit 12, a certificate of the federally insured status of "Lehman Brothers Bank, FSB." The certificate purported to cover Lehman Brothers Bank, FSB and all the branch offices of Lehman Brothers Bank, FSB. With respect to Count Four, there was no other evidence of the federally insured status of any other entity. As more fully set forth below, the government wholly failed to prove any fraud upon,

1

any loss of money by, or any risk of loss to, Lehman Brothers Bank, FSB.[1]

On March 14, 2005, Edelkind's trial counsel filed a one page Renewed Motion for Judgment of Acquittal asserting with respect to Count Four the absence of proof of fraud upon a federally insured financial institution. The motion, however, focused on the premise that Fairmont Funding LTD was the lender and that Fairmont Funding was not federally insured. That focus was too limited. The government, in fact, had wholly failed to prove that <u>any</u> federally insured entity was a victim of fraud in violation of 18 U.S.C. § 1344. This Second Renewed Motion expands the focus.

Edelkind has not styled the current motion as a motion for reconsideration of the "Renewed Motion," which the court denied on March 24, 2005, because he contends that the current motion is independently timely under Rule 29(c)(1). Edelkind suggests that the forfeiture issues subject to jury determination, though by agreement left for the court to decide, extended the Rule 29(c)(1) time for a motion for acquittal to and including 7 days after the court's determination of those forfeiture issues. Should the court reject this argument, Edelkind requests that it treat this "Second Renewed Motion" as a request that the court reconsider its denial of the "Renewed Motion."[2]

---

[1] Current counsel for Edelkind was not his trial counsel. Only a portion of the transcript has been completed. Counsel has reviewed the trial exhibits and has had discussions with the client and with trial counsel. Counsel believes that his representations about the trial record are accurate.

[2] The motion is also timely to the extent that a federally insured victim is a jurisdictional requirement for violations of 18 U.S.C. § 1344. "[P]roof of FDIC insurance is not only an essential element of the bank fraud and false statement crimes, but it is also essential for the establishment of federal jurisdiction. . . . Criminal defendants may therefore claim that the Government insufficiently proved the jurisdictional element post-verdict." *United States v. Schultz*, 17 F.3d 723, 725 (5th Cir. 1994).

## THE COUNT FOUR EVIDENCE

Count Four featured only three entities who were possibly fraud victims − Fairmont Funding LTD ("Fairmount"), Lehman Brothers Bank, FSB ("Lehman FSB"), and "Aurora Loan Services" ("Aurora").[3] One representative from Fairmont, Isaac Aryeh, and one representative of Aurora, Kenneth Scott Brown, testified at trial. No representative of Lehman FSB testified.[4] The Aurora representative testified on direct examination that "Aurora Loan Services" was a "subsidiary" of Lehman FSB.[5] On cross, the representative acknowledged that he did not know whether Aurora was a wholly-owned subsidiary.[6] There was no other testimony and no trial exhibit that provided any additional detail of the relationship between Aurora and Lehman FSB. Aurora was simply a "subsidiary" that may or may not have been a wholly owned subsidiary.[7]

Edelkind's misrepresentations went either directly to Fairmont or through brokers to Fairmont. Fairmont was a mortgage lender who funded the loan in its own name from its own sources.[8] There was no evidence that

---

[3] Count Four of the Second Superseding Information made no reference to "Aurora Loan Services" and identified only Lehman Brothers Bank, FSB as a "financial institution as defined in Title 18, United States Code, Section 20." Aurora appears, and Lehman Brothers Bank, FSB effectively disappears, in the trial testimony.

[4] A transcript of most of the fourth day of trial has been completed. The trial testimony of Messrs. Aryeh and Brown is included.

[5] Day Four Trial Transcript, Excerpt, page 78. The actual testimony was that Aurora was a "subsidiary of Lehman Brothers."

[6] Day Four Trial Transcript, Excerpt, page 96.

[7] At trial, the "Aurora" entity was identified as "Aurora Loan Services." After appointment, current counsel reviewed both the government trial exhibits and the discovery materials it made available to defense counsel. A subpoena was directed to "Aurora Loan Services, Inc." The response came from "Aurora Loan Services LLC" on the letterhead of "Aurora Loan Services Inc." The 10K for the parent Lehman Brothers Holdings identifies "Aurora Loan Services LLC" as a subsidiary of Lehman Brothers Bank, FSB. Although the 10K does not purport to list all the subsidiaries, there is no listing for "Aurora Loan Services Inc."

[8] See Day Four Trial Transcript, Excerpt, pages 34 and 97 – 100.

Fairmont obtained its money from Lehman FSB, from Aurora, or from any other Lehman subsidiary. There was no evidence that Edelkind was ever aware of any communications between Fairmont and Aurora/Lehman. There was evidence, however, that Fairmont conformed the information it obtained from Edelkind to fit requirements for an intended resale to Aurora/Lehman[9] and that Aurora had at least conditionally approved a resale just prior to the loan closing between Linda Edelkind and Fairmont Funding.[10] Edelkind's current counsel has found no evidence from the testimony of the Fairmont representative, from the testimony of the Aurora representative, or from any trial exhibit that Aurora or anyone else actually purchased the loan from Fairmont, paid anything to Fairmont or has any obligation to pay anything to Fairmont.[11] If there were a purchase by Aurora, that purchase took place after Fairmont had funded its own money for the Edelkind loan and as part of a separate transaction between Fairmont and Aurora.[12] If Aurora did purchase the loan, none of the Aurora money went to or for the benefit of Edelkind or his wife Linda.

---

[9] See Day Four Trial Transcript, Excerpt, page 39. "Aurora/Lehman" is used because though all the communications and paperwork appear to have been between Fairmont and Aurora, the witnesses often use the term "Lehman" or "Lehman Brothers" for Aurora.
[10] Trial Exhibit 11B, dated August 24, 2004, is an Aurora document sent to Fairmont reflecting an "approved status" but subject to additional, as yet unmet, conditions for repurchase by Aurora. See Day Four Trial Transcript, Excerpt, page 98.
[11] The Fairmont representative testified as to an intention to sell to Aurora/Lehman. See Day Four Trial Transcript, Excerpt, pages 40, 66-68. But the Fairmont representative had no idea about an actual sale or the date or terms of an actual sale between Fairmont and Aurora/Lehman. Day Four Trial Transcript, Excerpt, page 68. The Aurora representative apparently assuming there was a sale had no idea when it may have occurred. See Day Four Trial Transcript, Excerpt, page 100. He also did not know whether there was any written agreement between Fairmont Funding and Aurora when they engage is a sales transaction or what the terms of any agreement may have been. See Day Four Trial Transcript, Excerpt, pages 99 (Top) and 100 (Bottom).
[12] Fairmont had not sold anything to Aurora prior to Fairmont/Edelkind closing. See Day Four Trial Transcript, Excerpt, page 99.

# ARGUMENT

## THERE WAS NO PROOF OF FRAUD ON A "FINANCIAL INSTITUTION" AS DEFINED IN 18 U.S.C. § 20

*United States v. Brandon*, 17 F.3d. 409 (1st Cir. 1994), is a relevant, but hardly a fully controlling, precedent for this case. As described in the opinion, *Brandon* involved a scheme to obtain loan financing from a federally insured bank, Bay Loan, by fraudulently representing the existence of down payments required by Bay Loan from the investors on whose behalf the loans were made. *Id.* at 418. Brandon and two other individuals set up a partnership, Dean Street, for the purpose of converting motels into condominiums, selling the condominiums to investors and then managing the collections of condominiums as motels. Bay Loan, a federally insured bank, agreed to lend the buyers of Dean Street's condominium units up to 80% of the purchase price of the units. Two mortgage broker companies, Homeowners and East-West, acted as intermediaries between the unit buyer/investors and Bay Loan. With respect to each of these brokers, Bay Loan agreed to act as the end financier. The brokers, who were not federally insured, provided intermediate financing which was part of an overall agreement with Bay Loan.

> Bay Loan was the actual lender for the Dean Street project and it financed every condominium sale involved in the scheme. By prior agreement, Homeowners and East West provided the original mortgages for the buyers and then sold them to Bay Loan. Homeowners and East-West would forward all the loan applications to Bay Loan for approval prior to providing the mortgages for the condominium units. The decision of whether to fund a particular

>mortgage rested entirely with Bay Loan and Bay Loan set the terms
>and conditions of each mortgage.

*Id*. at 419.

In addition, the brokers would not provide the financing without first getting Bay Loan's agreement to purchase and fund the loans. With respect to one of the brokers, its credit line specifically prohibited the disbursement of money without a commitment from Bay Loan to fund the loan. *Id.* at n. 3.

The scheme in *Brandon* was to defraud Bay Loan and the *Brandon* court made abundantly clear that Bay Loan was a direct, not an indirect, victim of the fraud. From the beginning the scheme was to obtain the Bay Loan financing, not to obtain the broker financing. "Bay Loan was in fact victimized by defendants' scheme to defraud. In addition the scheme was designed to obtain funds from Bay Loan <u>in particular</u> by fraudulently avoiding one of Bay Loan's requirements." (Emphasis added). Id. at 426, n. 14.

*Brandon* stands for the propositions (1) that a defendant need not know that the entity he victimizes is in fact federally insured and (2) that he need not knowingly target an institution that happens to be federally insured in order to be convicted of bank fraud. But there must be an actual direct victim of the scheme that is federally insured.

>We simply note that this case presents a situation of direct harm to
>Bay Loan resulting from a scheme specifically designed to
>fraudulently avoid the requirements of that federally insured bank in
>order to obtain funds originating directly from Bay Loan.

*Id*. at 427, n. 16.

Even if we assume, *arguendo*, that Fairmont dealt directly with Lehman FSB,and not with Aurora, and that Lehman FSB actually purchased the mortgage note from Fairmont, the government has not proven *Brandon*

6

type liability.  The difference is that the Lehman FSB connection is indirect; the Bay Loan connection was direct.  The Fairmont Lehman FSB transaction was separate and independent from the Edelkind Fairmont transaction.  In *Brandon*, Bay Loan was integrated into each loan transaction from the outset and it made no difference that brokers, East-West and Homeowners, were intermediaries.  In this era of complex mortgage backed securitization *Brandon* type liability cannot attach any time a loan from a non-federally insured entity is sold to a federally insured entity.  There has to be some direct initial connection between the fraudulent transaction and a federally insured financial entity.

In any event, *Brandon* is not important or controlling in this case for more compelling reasons.  Edelkind submits that the focus should be on Aurora and not on Fairmont or Lehman FSB.  The only evidence of transactions beyond Edelkind and Fairmont are Fairmont's transactions with Aurora.  And if any entity actually purchased the mortgage note and was thereby defrauded, it was Aurora.

As already noted, Aurora is identified simply as a "subsidiary" of Lehman FSB.  There is no other description of the relationship between Aurora and Lehman FSB.  The Exhibit 12 certificate of FDIC insurance covers Lehman Brothers Bank, FSB and its branch offices.  There is no evidence that Aurora was a Lehman FSB branch office. Aurora, therefore, is not a federally insured financial institution as defined in 18 U.S.C. § 20.  It follows that § 1344 criminal liability for the Count Four offense can attach only if fraud upon a subsidiary of a federally insured financial institution is the equivalent of fraud upon the insured parent.

In *United States v. Walsh*, 75 F.3d 1, (1st Cir. 1996), Dime-NY was

the federally insured bank upon which § 1344 jurisdiction was based. But Dime-MA, the immediate maker of the loans to Walsh, was not federally insured, but was a wholly owned subsidiary of Dime-NY. The court found criminal liability under § 1344, but only after detailing the connections between the two entities and concluding that one was the *alter ego* of the other.

> Here, Dime-MA was practically an *alter ego* of Dime-NY: it was a wholly owned subsidiary of Dime-NY; all of the subsidiary's directors and principal officers were officers of the parent; and Dime-MA was subject to examination by the same federal bank examiners as Dime-NY and reported its results on a consolidated basis.
>
> Further, focusing on the loan process, the connection between the defendant and the federally insured victim is even tighter. Dime-NY provided all of the funds for Dime-MA both for its operating expenses and to fund mortgage closings. Dime-NY determined what loan products should be offered and, on the closing of a loan by Dime-MA, the mortgage was immediately assigned to Dime-NY, which then serviced the loan. For most practical purposes, and certainly for the purposes underlying section 1344, the mortgage fraud perpetrated against Dime-MA was effectively a fraud against Dime-NY.

*Id.* at 9.

The *Walsh* court noted this was a fact specific determination and confined its decision "to the present facts" declining "to contrive general rules to govern myriad variations." *Id*. This case is not like *Walsh*. The only evidence of any connection between Aurora and Lehman FSB is that it is a subsidiary, and perhaps not a wholly owned subsidiary, of the federally insured parent. There was no evidence whatsoever that Lehman FSB was involved in this transaction in any way, was the source of any of Aurora's funds, or is subject to any liability or risk of loss as the result of Aurora's participation.

*United States v. Bortnick*, 2004 WL 2752471 (E.D.Pa.) is a case

directly on point. There the defendant's fraudulent statements were made to Congress Financial Corporation. Congress was not a federally insured financial institution. It was, however, a wholly owned subsidiary of First Union National Bank which was a federally insured financial institution. The case was before the court on a motion to dismiss the indictment. The principal case the government cited in opposition was *Walsh*. The court noted that *Walsh* was on point, but dismissed the indictment on the following grounds:

> While this Court might conclude that First Union was naturally affected by defendant's alleged fraud on one of its wholly-owned subsidiaries, it cannot leap to the conclusion that defendant's alleged fraud deprived First Union of its monies or other property without more information than the bare assertion that a parent- subsidiary relationship existed between the two. Moreover, applying the principles of *Walsh*, the court finds that the factual allegations of the indictment are insufficient to establish that Congress is the equivalent of a financial institution under the bank fraud statute. Unlike in *Walsh*, the indictment establishes no connection between First Union's federally-insured funds and those extended to Defendant by Congress.
>
> The indictment contains no factual allegations that would support an indictment of Defendant for fraudulent activities directed at First Union, the only financial institution mentioned in Count One. The indictment does contain factual allegations that would support an indictment for fraudulent activities directed at Congress. However, this Court can locate no binding case law that would support a finding that the United States' assertion that Congress is a subsidiary of First Union is a specific enough factual basis to satisfy the "financial institution" requirement of § 1344. At the very least, the United States would need to allege facts establishing some connection between Defendant's activities and the federally-insured funds. As it has not done so, Defendant's Motion to Dismiss is granted for failure to state a criminal offense.

*Id*. at 3-4.

In *United States v. Schultz*, 17 F.3d 723, (5th Cir. 1994) the defendant directed his fraudulent statements to Texas Commerce Bank-Sugar Land, but the government produced a certificate of insurance for TCB-National Association. Although the government proved that the two banks were related, the court held that though Texas Sugarland bank was related to the federally insured bank, the "relationship" with an insured entity was "patently insufficient" to prove that Texas Sugarland was insured. *Id*. at 727.

In *United States v. Agne*, 214 F.3d. 47 (1st Cir. 2000) the First Circuit Court of Appeals confronted a slightly different issue but its resolution of that issue is meaningful here. The statute of limitations in 18 U.S.C. § 3282 requires that wire fraud charges be brought within five years of the offense. However, under 18 U.S.C. § 3293(2) there is a ten year statute when the "offense affects a financial institution." The question addressed in *Agne* was whether a particular offense "affected" a financial institution within the meaning of the statute. Whether a financial institution is defrauded under 18 U.S.C. § 1344, of course, requires more than an "affect" on the institution. *See Bortnick, supra*, at 2. Although less was required, the court in *Agne* concluded that there must be at least some impact or risk of loss on the financial institution to support application of the extended statute of limitations. *See Agne, supra*, at 51-52. In the instant case, the government failed to prove that there was any impact on the only entity federally insured, Lehman FSB.

## CONCLUSION

For the foregoing reasons, the court should enter a judgment of acquittal on Count Four of the Second Superseding Information.

                        JAMIE EDELKIND

                        By his attorney,

                        s/ Michael J. Liston

                        _____
                        Michael J. Liston BBO# 301760
                        2 Park Plaza, Suite 610
                        Boston,  MA  02116
                        (617) 426-2281

June 8, 2005