UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                       )
**UNITED STATES OF AMERICA**           )
                                       )
                                       )  CRIMINAL NO.
       v.                              )  04 − 10066 MEL
                                       )
                                       )
**JAMIE EDELKIND**                     )
_____)

**DEFENDANT JAMIE EDELKIND'S SENTENCING MEMORANDUM**

This sentencing memorandum is submitted on behalf of the defendant Jamie Edelkind ("Edelkind"). It is intended to cover the two central guideline issues − loss calculation under §2B1.1(b)(1) and the "gross receipts" enhancement under §2B1.1(b)(13). Because restitution is related to loss calculation, it is also treated. Other relevant issues, particularly consideration of § 3553 (a) factors, will be addressed at the sentencing hearing.

**I.    LOSS CALCULATION PURSUANT TO U.S.S.G §2B1.1**

The applicable Guidelines are the current Guidelines, i.e., the Guidelines as amended through November 1, 2004. See PSR ¶ (30). The principal Guideline section for offense level calculations for violations of 18 U.S.C. § 1344 is §2B1.1. See PSR ¶ (31). The base offense level for Edelkind's conviction, under §2B1.1(a)(1), is 7. See PSR ¶ (33). None of the foregoing is at issue.

Edelkind does take issue with the PSR ¶ (34) loss calculation of

approximately $1,300,000 and the consequent application of a 16 point increase in the offense level under §2B1.1(b)(1)(I).[1] PSR ¶ (34) suggests that the starting point for loss calculation is the $3,300,000 "amount the defendant fraudulently obtained."[2] Even assuming *arguendo* that the loss at issue is the loss to Fairmont, the private lender who funded the Linda Edelkind loan, rather than the loss to any federally insured entity which served as the jurisdictional base for Edelkind's conviction under Count Four of the Second Superseding Information,[3] the $3,300,000 starting point must be adjusted by deducting the "Exclusions from Loss" required by Application Note 3. (D) (i) to §2B1.1(b)(1) and the "Credits Against Loss" required by Application Note 3. (E) (i) and (ii) to §2B1.1(b)(1).

Government Trial Exhibit J10, the Final Hud-1, reflects settlement charges to the borrower in the amount of $149,940.91.[4] These were costs or advances associated with obtaining the financing that were never "received" by the borrower. They should be deducted under Application Note 3 (D)(i).[5]

---

[1] Under Application Note 3. A (i) and (ii) to §2B1.1(b)(1) the court is to apply the greater of "Actual Loss" or "Intended Loss." The PSR calculates the loss as an "actual loss" and not as an "intended loss." There is no reference to, analysis of, or finding relative to "any intended loss" in the PSR. Edelkind submits that this was for good reason: there was in fact no intended loss.

[2] Under Application Note 3(B) a defendant's "gain" from the fraud is an alternative measure only if the loss to the victim can not be determined reasonably. Although the PSR ¶ (34) language suggests a measurement of "gain" it is also a measurement of the theoretically possible loss to Fairmont Funding who funded the Linda Edelkind loan.

[3] The defendant maintains his position that there was no fraud upon, and therefore no loss to, a "financial institution" within the meaning of 18 U.S.C. § 1344. In addition, there was no trial evidence that, and no "finding" in the PSR that, either Lehman Brothers Bank, FSB or Aurora Loan Services "lost" anything, because there was no evidence as to what either may have paid Fairmont for the Note and mortgage that was purchased.

[4] A copy of the first page of Government Trial Exhibit J10, the Final HUD-1 Statement, is attached as Exhibit F.

[5] The Final Hud-1 Statement, Exhibit F, also reflects a financing charge from "XL Lending Group" in the amount of $28,875.00. This too would ordinarily be deducted, but an FBI 302 of an interview with the closing attorney suggests that the $28,875.00 item

In addition, Linda Edelkind made one mortgage payment in the amount of $29,218.21 by check dated October 4, 2004.[6] A portion of this payment, namely, $1,802.55, is repayment of principal made prior to any "detection" of the offense within the meaning of Application Note 3. (E) (i).[7] Deducting the exclusion − $149,940.91 − and the credit − $1,802.55 − from the $3,300,000 face amount of the Fairmont loan, and rounding off to the nearest $1,000, leaves $3,148,000.

The collateral for the loan from Fairmont, Linda Edelkind's residence at 940 Nantasket Road in Hull, Massachusetts, will not have been "disposed of" at the time of sentencing, and, thus, pursuant to Application Note 3. (E) (ii) to §2B1.1(b)(1),[8] there must be an additional credit to Edelkind for "the fair market value of the collateral at the time of sentencing." PSR ¶ (34) recognizes the applicability of Application Note 3. (E)(ii), but suggests an "estimated" value of only $2,000,000, and proceeds to use that figure to calculate a loss of over $1,000,000. The only "support" in the PSR for the $2,000,000 estimate is the adopted government assertions, contained in PSR ¶ (26), (1), that in a recorded telephone conversation while Edelkind was in prison, Linda Edelkind advised that in the fall of 2004 "a local realtor

---

should have been paid outside of the closing by Fairmont and not listed on the HUD-1. That amount should have been refunded to Linda Edelkind, but was not because the closing attorney, apparently, used those proceeds to pay other Linda Edelkind expenses.

[6] This fact was part of a trial stipulation. See one page Excerpt from Proceedings on March 4, 2005.

[7] Counsel for Edelkind derived the amount of the principal paid in October, 2004 by deducting from the face amount of the Fairmont loan − $3,300,000 − the remaining principal amount due on the note − $3,298,197.45 − as set forth in PSR ¶ (27).

[8] Application Note 3. (E) (ii) also applies a credit, in cases involving pledged collateral, for the "amount the victim has recovered at the time of sentencing from disposition of the collateral." This "credit" produces a zero loss result for each of the other three counts for which Edelkind was convicted. Each of those loans, collateralized by the property, was fully paid off by subsequent refinancings culminating in the refinancing from Fairmont.

declined to list the house for more than $2,000,000"[9] and (2) that "[a]ccording to Elliot Wales, Esq., counsel for Fairmont Funding Ltd., the property has recently been appraised at approximately $1,800,000."[10]

The most recent appraisals of the Linda Edelkind property, of which counsel for Edelkind is aware, are the two appraisals obtained in connection with the Fairmont loan. The existence of appraisals in excess of $5,000,000 is acknowledged in PSR ¶ (26), but otherwise ignored.[11]

There were in fact two "independent" appraisals by certified professional appraisers supporting the Fairmont loan. Each appraisal values the property as of June, 2004, only a year ago. Fairmont submitted these two "independent" appraisals to "Aurora Loan Services," an entity identified at trial as a subsidiary of Lehman Brothers.[12] One of the appraisals, dated June 24, 2004, was prepared by Regatta Appraisal Service of Weymouth, Massachusetts (the "Regatta Appraisal"). It appraised the property as of June 23, 2004. The stated appraised value was $5,300,000. The other appraisal, dated June 7, 2004, was prepared by Howard S. Dono & Associates, Inc. (the "Dono Appraisal"). It appraised the property as of June

---

[9] There was such a discussion but the government failed to tell the Probation Office that in the course of the discussion both Edelkind and his wife noted how "ridiculous" and "silly" such a figure was in light of appraisals in excess of $5,000,000.

[10] No such $1,800,000 appraisal was submitted to the Probation Office. Counsel for Edelkind is unaware of any such appraisal. It should be noted that Fairmont Funding Ltd., through its attorney Elliot Wales, seeks a restitution order in the amount of $3,300,000. See Memorandum of Fairmont Funding in Support of Its Claim of a "Legal Interest," page 13.

[11] PSR ¶ (26) includes the following statement: "Although Edelkind secured appraisals ranging to over $5,000,000, these appraisals are notably lacking in comparable properties located in, or near, Hull, Massachusetts." This is a word for word adoption of the government submission to the Probation Department on March 14, 2005. The intended implication is that the appraisals were generated by Edelkind and are not trustworthy. As will be more fully set forth in the body of this Memorandum, the intended implication is unsupported.

[12] Day Four Trial Transcript Excerpt, page 76.

4, 2004.  The stated appraised value was $5,200,000.  A copy of the Regatta Appraisal is attached as Exhibit A.  A copy of the Dono Appraisal is attached as Exhibit B.

On May 12, 2005, undersigned counsel for Edelkind, telephoned Regatta Appraisal Service and spoke with Susan Troup.  She was the "Supervisory Appraiser" of the Regatta Appraisal of the Linda Edelkind property and, as such, she certified the $5,300,000 estimate of the fair market value of the Linda Edelkind property as of June 23, 2004.  Ms. Troup told Edelkind's counsel that, without reservation, she continued to stand by the opinion of value contained in the Regatta Appraisal.

On May 12, 2005, undersigned counsel for Edelkind, also telephoned Howard S. Dono & Associates, Inc. and spoke with Howard S. Dono.  He was the "Supervisory Appraiser" of the Dono Appraisal of the Linda Edelkind property and, as such, he certified the $5,200,000 estimate of the fair market value of the Linda Edelkind property as of June 4, 2005.  Mr. Dono also told Edelkind's counsel that, without reservation, he continued to stand by the opinion of fair market value contained in the Dono Appraisal.

Fairmont is a "correspondent" seller engaged from time to time in sales to "Aurora/Lehman"[13] of mortgage loans that it − Fairmont − originates.  There was trial evidence that Fairmont funded the loan to Linda Edelkind from its own sources in August of 2004 and a trial stipulation that "Lehman Brothers Bank bought the Linda Edelkind loan and mortgage on or

---

[13] There is an unresolved dispute between the defendant and the government with respect to the identity of the entity with whom Fairmont dealt in connection with the Linda Edelkind loan.  Edelkind contends that Aurora Loan Services, a subsidiary of Lehman Brothers Bank, FSB, purchased the Linda Edelkind Note and mortgage.  The government contends that Lehman Brothers Bank, FSB, and not its subsidiary, purchased the Note and mortgage.  The dispute is the subject of a pending Edelkind motion for an evidentiary hearing.

after September 28, 2004."[14]  Fairmont's sales transactions with Aurora/Lehman are subject to the terms and conditions of the "Aurora Loan Services Inc. Seller's Guide."[15]

There was trial evidence that Fairmont submitted the Regatta Appraisal and the Dono Appraisal to Aurora Loan Services in support of its request for repurchase approval of the Linda Edelkind mortgage loan.[16] Subsection KK of Section 7 of the Aurora Seller's Guide which governed Fairmont's transaction with Aurora/Lehman provides, in relevant part, as follows:

> **Real Estate Appraisals**.  Notwithstanding anything contained in this Seller's Guide or the Purchase Agreement, Seller hereby represents and warrants that (i) all appraisals conducted in connection with each Mortgage Loan comply with applicable federal and state law, and the requirement of the Agencies and were conducted by a qualified appraiser, <u>duly appointed by the Seller</u>, who had no interest, direct or indirect, in the Mortgaged Property or in any loan made on the security thereof, and whose compensation is not affected by the approval or disapproval of the Mortgage Loan and (ii) with respect to any appraisal requirements imposed by or pursuant to the Financial Institutions Reform Recovery and Enforcement Act of 1989 ("FIRREA"), the related Mortgage Loan is eligible for purchase by a financial institution subject to FIRREA, and, in the case of conforming loan sizes, by the Agencies. (Emphasis added).

Thus Fairmont represented to Aurora/Lehman that fully independent

---

[14] A significant part of the unresolved dispute referenced in the preceding note is the accuracy in fact of the trial stipulation.

[15] At the June 13th Status Conference the government supplied documents that appeared to include a portion of the Aurora Loan Services Inc. Seller's Guide.  It also produced a fully executed Loan Purchase Agreement between Fairmont and Aurora Loan Services Inc. that was dated July1998.  This Loan Purchase Agreement referenced the Aurora Loan Services Inc. Seller's Guide.  The government subsequently produced a copy of a fully executed Loan Purchase Agreement between Fairmont and Lehman Brothers Bank, FSB that was dated August, 2001.  This Loan Purchase Agreement also referenced the Aurora Loan Services Inc. Seller's Guide.  Counsel for Edelkind has requested, but has not yet received, a complete copy of the Aurora Loan Services Inc. Seller's Guide.

[16] Day Four Trial Transcript Excerpt, page 76.

and "qualified" appraisers conducted the Regatta Appraisal and the Dono Appraisal, that it, not Edelkind, appointed those appraisers, and that the appraisals were conducted in compliance with all federal and state laws, with all "Agency" requirements, and with all FIRREA requirements. In short, Fairmont endorsed the appraisals.

Aurora/Lehman did the same. Lehman Brothers Holdings, Inc. ("Lehman Holdings") is the principal and only publicly traded "Lehman Brothers" company. Lehman Brothers Bank, FSB is a subsidiary of a subsidiary of Lehman Holdings, and Aurora Loan Services[17] is a subsidiary of Lehman Brothers Bank, FSB. Lehman Holdings' 2004 Annual Report describes itself as a market leader in mortgage-backed securities trading. "We originate residential and commercial mortgage loans as an extension of our securitization activities. In 2004 we originated approximately $65.1 billion of residential mortgage loans and we securitized approximately $120.5 billion of residential mortgage loans, including both originated loans and those we acquired in the secondary market." 2004 Annual Report, page 69. The Linda Edelkind Note and mortgage either landed in or was destined for one of the Lehman securitization pools.

From a random selection of several Lehman securitization prospectuses, Edelkind's counsel has concluded that the bulk of loans

---

[17] Actually, at least during 2004, there appears to have been two "Aurora" corporate entities − "Aurora Loan Services LLC" and "Aurora Loan Services Inc." The 2004 Annual Report for Lehman Brothers Holdings, Inc. lists only "Aurora Loan Services LLC" as a subsidiary of Lehman Brothers Bank, FSB, but not every subsidiary need be listed. On December 20, 2004, "Aurora Loan Services Inc." filed an Annual Report with the Secretary of State of the Commonwealth of Massachusetts. On January 5, 2005, "Aurora Loan Services LLC" applied to the Massachusetts Secretary of State for registration as a Foreign Limited Liability Company and in the application stated that the date of its organization in Delaware was May 15, 1997. It appears that at trial there was reference only to "Aurora Loan Services."

7

"Lehman" originated for its securitization pools were originated by Aurora Loan Services and not by Lehman Brothers Bank, FSB. For example, in a Prospectus Supplement, dated April 28, 2005, and filed[18] with the Securities Exchange Commission in connection with a Lehman securitization which pooled almost $500,000,000 of mortgage loans, Aurora Loan Services was described as having originated almost 80% of the loans.[19] In that Prospectus there is a description of the Aurora Underwriting Guidelines that were used in connection with Aurora's acquisition of the loans it originated. Those Guidelines, as they related to property appraisals, were as follows:

> The Aurora Underwriting Guidelines are applied in accordance with a procedure that generally requires (1) an appraisal of the mortgaged property (and generally, in the case of a mortgaged property with a loan amount exceeding $650,000, two appraisals), by qualified independent appraisers, that conforms to Fannie Mae and Freddie Mac standards and (2) a review of such appraisal by Aurora and, depending upon the original principal balance and loan-to-value ratio of the mortgaged property, may include a field review of the original appraisal by another independent appraiser. Each appraisal includes a market data analysis based on recent sales of comparable homes in the area and a replacement cost analysis based on the current cost of constructing a similar home.

The Regatta Appraisal and the Dono Appraisal each conform to the Aurora/Lehman guidelines.[20] The trial testimony of Kenneth Scott Brown,

---

[18] The Prospectus Supplement was filed by "Structured Asset Securities Corporation" a Lehman Holdings affiliated entity.

[19] The Prospectus Supplement, at S-39, further described Aurora as "a wholly owned subsidiary of Lehman Brothers Bank, FSB engaged principally in the business of (i) originating, purchasing and selling residential mortgage loans in its own name and through its affiliates, (ii) servicing residential mortgage loans for its own account, (iii) master servicing residential mortgage loans for the account of its affiliates and (iv) servicing and subservicing residential mortgage loans for the account of its affiliates and others."

[20] Particularly, each included a valuation by a reconstruction cost approach and a valuation by comparable sales.

the witness from Aurora Loan Services, confirmed that Aurora received the two appraisals and that the two appraisals were sent to a "special appraisal review department" where they were reviewed "for accuracy and value."[21] Government Trial Exhibit 11cc, page 1, an Aurora/Lehman document, describes the quality of the $5,200,000 Dono Appraisal, − the "original appraisal" − as "Average." The "quality" of the $5,300,000 Regatta Appraisal − the "Second Full Appr."− is not listed. The quality of the property is described as "Good."[22] A copy of the first page of Government Trial Exhibit 11cc is attached as Exhibit C. Thus, Edelkind submits, Aurora/Lehman independently endorsed the two appraisals Fairmont submitted.

Attached hereto as Exhibit D is the Affidavit of Thomas H. L. Curtis ("Curtis Affidavit"). Mr. Curtis is a residential real estate agent for the William Raveis Real Estate office in Hingham, Massachusetts. He is fully familiar with residential properties in Hull, Massachusetts and the market for residential properties in Hull, Massachusetts.[23] He has noted that the real estate market in Hull, Massachusetts has not changed in any dramatic way within the past year and the housing prices have generally remained flat.[24] In the fall and early winter of 2004, Mr. Curtis examined the full interior of the Linda Edelkind property on at least two occasions.[25] Linda Edelkind showed him "before and after photos" demonstrating that there had been

---

[21] Day Four Jury Trial Excerpt, page 96. The review was a "desk" review, not a "field" review.
[22] Government Trial Exhibit 11cc refers to a $5,200,000 "Lender Appraised Value." Although not entirely clear, it is likely that in this context "Lender" refers to Fairmont rather than to Aurora/Lehman.
[23] Curtis Affidavit, ¶ 1.
[24] Curtis Affidavit, ¶ 6.
[25] Curtis Affidavit, ¶ 3.

9

dramatic improvements made to the property, both inside and outside.[26] On one of the occasions, in late November or early December, 2004, Mr. Curtis viewed the premises with his colleagues at the William Raveis agency and it was the consensus that the house had a market value of up to $4,000,000.[27] When he subsequently told Linda Edelkind that the William Raveis agency proposed to list the property at $4,000,000, she plainly indicated a belief that the price was too low.[28]

Mr. Curtis has more recently viewed the premises, albeit from the outside, and has noted some deterioration since the fall of 2004. With that in mind, he has expressed an opinion that the fair market value of the real estate at 940 Nantasket Avenue in Hull, Massachusetts, as of July 1, 2005, is in the range of $3,700,000 to $4,000,000.[29]

The government bears the burden of proving the amount of loss by a preponderance of the evidence. *See, e.g., United States v. Acosta*, 303 F.3d 78, 82 (1st Cir. 2002). The government has not proven by a preponderance of evidence that the fair market value of the loan collateral, i.e., the mortgaged property at 940 Nantasket Avenue, Hull, Massachusetts, does not exceed the total amount of any loss. The government has thus failed to demonstrate that there has been a loss. Under §2B1.1(b)(I)(A), if the loss is $5,000 or less, there is no increase in the base offense level. Thus, after the loss calculation, Edelkind's offense level remains at level 7.

## II. RESTITUTION PURSUANT TO 18 U.S.C. §§ 3663A AND 3664 AND U.S.S.G. 5E1.1

Title 18 U.S.C. §§ 3663 (a) and (c)(1)(B) provide for an order of

---

[26] Curtis Affidavit, ¶ 4.
[27] Curtis Affidavit, ¶ 5
[28] Curtis Affidavit, ¶ 5.
[29] Curtis Affidavit, ¶ 6.

restitution to identifiable victims who suffer "pecuniary loss" as the result of the defendant's crime. "An order of restitution is a separate calculation from the calculation of loss," *United States v. Antonakopoulos*, 399 F.3d 68, 83 (1st Cir. 2005), and that calculation is governed by statute. *Id*. at 84 n. 14. In this case, the relevant statutes are 18 U.S.C. §§ 3663A and 3664. Under § 3664(e) the amount of the restitution must be determined by the court by a preponderance of evidence and "[t]he burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the government."

Notwithstanding the fact that the calculation of loss for purposes of restitution is independent of a calculation of loss under §2B1.1, the determination of the amount of loss engages the same principles. As matters now stand, no victim's loss can be measured without reference to the fair market value of the collateral.

Under 18 U.S.C. § 3663(a)(2) a victim "means a person directly and proximately harmed as the result of the commission of the offense." PSR (115) identifies "Lehman Brothers Bank" as the victim and sets forth $3,298,197.45 as the warranted restitution amount. Edelkind objected to PSR ¶ (115).

The restitution figure was drawn from a victim impact statement sent to the government on May 31, 2005, from Aurora Loan Services LLC. However, Aurora's response to the government inquiry as to loss sustained was a reference to an attached Exhibit A which stated, *inter alia*: "On September 30, 2004, Lehman Brothers Bank FSB ("Lehman") purchased from Fairmont Funding a loan secured against the property in the amount of $3,298,197.45." The statement standing alone is ambiguous. It could either

11

refer to the price that Aurora/Lehman paid to Fairmont for the Note and mortgage or to the principal balance due on the Note and mortgage. Other documents that were submitted as part of the impact statement reveal that the $3,298,197.45 figure is simply the principal balance due on the Note[30] and not the amount that Aurora/Lehman paid to Fairmont.[31] Although there is no identification of Fairmont as a victim in the PSR, it has also filed an impact statement and it seeks $3,300,000, the full amount of its loan to Linda Edelkind, in restitution.[32]

Neither Aurora/Lehman, Fairmont, or the government has provided any evidence of an actual loss but simply, in the case of Aurora/Lehman, the principal amount of the Note and, in the case of Fairmont, the original amount of its loan. These are not loss figures. No consideration is given the fair market value of the collateral securing the Note. That value, as demonstrated above, exceeds the amounts that either Aurora/Lehman or Fairmont claims is currently due. The government has not met its burden under 18 U.S.C. § 3664 (e) of demonstrating an amount of loss to any victim.

## III.   ENHANCEMENT PURSUANT TO §2B1.1(b)(13).

PSR ¶ (35) applies a 2 point offense level increase pursuant to U.S.S.G. §2B1.1(b)(13)(A). This guideline section subdivision provides a minimum two point offense level enhancement if "the defendant derived

---

[30] The Exhibit A referred to an attached pay off statement reflecting that as of May 27, 2005 the total unpaid principal balance was $3,298,197.45.

[31] On July 1, 2005, in response to Edelkind's motion for an evidentiary hearing to determine whether Aurora or Lehman Brothers Bank, FSB actually purchased the Linda Edelkind Note, the government filed an affidavit reflecting a payment to Fairmont on September 28, 2004 in the amount of $3,376,962.23.

[32] See Memorandum of Fairmont Funding In Support of Its Claim of a "Legal Interest," page 13.

more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense."[33]  There should be no "gross receipts" enhancement applied in this case.

<center>**A.**</center>

**The Defendant Did Not "Individually" Derive Gross Receipts In Excess Of $1,000,000.**

Application Note 11(A) to §2B1.1(b)(13) provides that "the defendant shall be considered to have derived more than $1,000,000 in gross receipts if the gross receipts <u>to the defendant individually, rather than to all participants,</u> exceeded $1,000,000." (Emphasis added).  Application Note 11(B) defines "gross receipts" to include "all property, real or personal, tangible or intangible, which is obtained directly or indirectly as a result of such offense."

In each of the counts of the Second Superseding Information for which Edelkind was convicted he was charged both as a principal under 18 U.S.C. § 1344 and as an aider and abettor under 18 U.S.C. § 2.  Linda Edelkind, though not herself yet charged, was the other participant for 18 U.S.C. § 2 purposes.

For each of the counts of Edelkind's conviction, the property at 940 Nantasket Avenue in Hull, Massachusetts served as the collateral securing the loans that were obtained.  Linda Edelkind always owned the property

---

[33]  The two points is a minimum because subdivision (D) of §2B1.1(b)(13) provides that "[i]f the resulting offense level determined under subdivision (A) or (B) is less than level 24," then the offense level is increased to level 24.  PSR ¶ (35) added only two points under subdivision (A) because PSR ¶ (34) had already increased the offense level from the base level 7 to level 23 by a loss calculation in excess of $1,000,000.  If as Edelkind has urged in the first part of this Memorandum, there is no loss, then an application of an enhancement under §2B1.1(b)(13) would raise the offense level from the base level 7 under §2B1.1(a)(1) to level 24.

that secured each of the loans. Jamie Edelkind never had a legal or equitable interest in the property. In 1998, well prior to any of the fraudulent conduct asserted in the four counts of conviction, Edelkind had executed a Prenuptial Agreement in Linda Edlekind's favor providing, in relevant part, that in the event "Linda [Edelkind] comes into any property or assets, they shall be and remain her sole personal property." A copy of this Prenuptial Agreement is attached as Exhibit E.

For each of the counts of Edelkind's conviction, the loans were to Linda Edelkind and all the proceeds of the loans were paid either directly to her, to release liens on her property that were the result of her prior loans, or to pay financing or other settlement charges attached to her loan closings. For example, the full amount of the Count Four loan from Fairmont was $3,300,000. The final HUD-1 Statement, Government Trial Exhibit J10 ("Hud-1 Statement"), a copy of the first page of which is attached as Exhibit F, reveals that $2,113,537.20 of the Fairmont loan amount was paid directly to Washington Mutual. This payment was made to discharge Washington Mutual's mortgage on Linda Edelkind's property resulting from the loan she obtained from Washington Mutual in March of 2003.[34] The Hud-1 Statement also reveals that $356,242.38 of the loan amount was paid to Wells Fargo. This payment was made to discharge the lien on the property Linda Edelkind owned resulting from the home equity line she obtained from Wells Fargo in May of 2002.[35] Only Linda Edelkind, and not Jamie Edelkind, was liable under the notes that Linda Edelkind signed in favor of Washington Mutual and Wells Fargo.

---

[34] The Washington Mutual loan was the subject of Count Three of the Second Superseding Information.

[35] The Wells Fargo equity line was the subject of Count Two of the Second Superseding Information.

The HUD-1 Statement also shows settlement charges, principally to Fairmont Funding, in the amount of $149,940.91 and a miscellany of other charges totaling $110,400.68. None of these amounts went to or were paid for the benefit of Jamie Edelkind.

The foregoing payments, in combination, total $2,730,121.17. The difference between this amount and the $3,300,000 face amount of the loan from Fairmont is $569,878.83. Notwithstanding this balance, the apparent "cash-out" to Linda Edelkind was in the form of two checks Fairmont made payable to Linda Edelkind, a Sovereign Bank check in the amount of $569,878.93 and a JP Morgan Chase Bank check in the amount of $9,926.80.[36] These two checks total $579,805.73. The "cash-out" was sent to and received by Linda Edelkind.

Under U.S.S.G. §1B1.3 a defendant is generally responsible for the conduct of others in the course of jointly undertaken criminal activities. However, Application Note 11(A) expressly disavows such "joint" responsibility in connection with enhancement under §2B1.1(b)(13). Under the Application Note a defendant is "considered to have derived more than $1,000,000 in gross receipts" only "if the gross receipts <u>to the defendant individually, rather than to all participants,</u> exceeded $1,000,000." (Emphasis added).

> The sentencing court must determine the amount derived from the offense by each defendant individually. *United States v. Millar*, 79 F.3d 338, 346 (2d Cir. 1996). It follows that in making that determination, no part of the amount found to have been derived by one defendant can be counted as having been derived by another

---

[36] These two checks, although they exceed the "cash-out" suggested in the HUD-1 Statement, are among the fraud proceeds the government sought in the Forfeiture Allegations of the Second Superseding Information.

15

defendant.

*United States v. Kohli*, 110 F.3d 1475, 1477 (9th Cir. 1997).

In *United States v. Castellano,* 349 F.3d 483 (7th Cir. 2003), the gross receipts from the offense of conviction exceeded $1,000,000 but the issue was whether the defendant "obtain[ed] $1,000,000 of receipts `individually." *Id.*, at 486. In that case, the receipts went into the coffers of an Illinois corporation. Less than $200,000 reached the defendant as salary, expense reimbursement, or as some other form of benefit. Another person owned all the shares of the corporation. However, the district court had determined that corporate formalities should be disregarded because the defendant, not the person who owned the shares, dominated the company. The Court of Appeals vacated the enhancement and remanded the matter "to decide whether under Illinois veil piercing principles [the defendant] is personally accountable for the receipts and obligations of [the corporation.]" *Id.* See also, *United States v. Colton*, 231 F.3d 890, 911 (4th Cir. 2000) (only the amounts "kicked-out" to each defendant counted; no attribution of corporate receipts to a shareholder −as "indirectly" derived receipts − because shareholder had only a fifty percent interest in the corporation.). *Cf., United States v. Pendergraph*, 388 F.3d 109, 113 (4th Cir. 2004) (attributing corporate receipts to sole corporate shareholder). In the instant case, there are no "veil piercing" possibilities. Only Linda Edelkind was liable for the underlying debt that the refinancings removed. Only she derived the proceeds that paid off that debt.[37]

---

[37] It is at least arguable that Linda Edelkind did not "derive" within the meaning of §2B1.1(b)(13), the amounts paid to third parties to remove prior liens on her property. As already noted, over $2,000,000 of the Count Four loan proceeds was paid to Washington Mutual, and over $350,000 to Wells Fargo, to remove existing mortgage liens on the real estate collateral that was to serve as security for funds received from

As ungallant as the foregoing argument might appear, the plain fact remains that Jamie Edelkind, although he might be primarily responsible for the fraud, did not "individually" derive from his fraud, directly or indirectly, anything in the neighborhood of $1,000,000. There should be no enhancement under §2B1.1(b)(13).

**B.**

**With Respect To Count Four, To Which The PSR Attaches The §2B1.1(b)(13) Enhancement, The Defendant Did Not Derive Any Receipts From A "Financial Institution."**

The §2B1.1(b)(13) enhancement applies if a defendant derives from his offense more than $1,000,000 "from" one or more "financial

---

Fairmont. When Linda Edelkind borrowed from Fairmont there were mortgage liens on her property in excess of $2,350,000. When she completed the loan process with Fairmont, it had a mortgage lien on her property of $3,300,000 and she had a "cash-out" of less than $1,000,000. In *United States v. Mingo*, 340 F.3d 112, 114 (2d Cir. 2003), the defendant, Mingo, obtained mortgage loans for real estate through fraudulent means. He conceded that if the value of the properties obtained with the loans is added to his cash proceeds from the offense, the "gross receipts" enhancement would apply, but he urged that the value of the liens the lenders secured be subtracted from the value of the properties for purposes of calculating his gross receipts from the fraudulent scheme. Thus in Mingo's case, he had obtained the properties with the fraudulent loans and had acquired the use of the properties as the result of his offenses. On that basis the court included the value of the properties in determining whether Mingo's gross receipts exceeded $1,000,000.

In this case, and with respect to each of the four counts for which Edelkind was convicted, Linda Edelkind already owned the property, although it was burdened with mortgage liens. At each new refinancing, the identity of the lien holder changed and the amount of the lien increased. All that was "derived" from the fraudulent scheme by any combination of participants was at most the difference between the paid off liens and the full amount of the new loan. Otherwise, nothing had changed. For example, before the Fairmont loan closed, Linda Edelkind owned property burdened with more than $2,350,000 in mortgage liens. After the loan closed, she owned property burdened with $3,300,000 in mortgage liens. It follows that all she, or any other participant, actually derived from the transaction was the difference between those two figures.

17

institutions." Although Edelkind was convicted under Count Four of the Second Superseding Information for defrauding a "financial institution" within the meaning of 18 U.S.C. §§ 20 and 1344 and, therefore, also within the meaning of §2B1.1(b)(13), the Count Four loan proceeds came "from" Fairmont Funding which was not federally insured and not a "financial institution," at least within the meaning 18 U.S.C. § 20. However, the definition of a "financial institution" for §2B1.1(b)(13) purposes is broader than the definition of a "financial institution" for prosecution under 18 U.S.C. § 1344.

Application Note 1 to §2B1.1 defines a "financial institution," in relevant part, as follows:

> "Financial institution" includes any institution described in 18 U.S.C. § 20, § 656, § 657, § 1005, § 1006, § 1007, or § 1014; any state or foreign bank, trust company, credit union, insurance company, investment company, mutual fund, savings (building and loan) association, union or employee pension fund; any health, medical, or hospital insurance association; brokers and dealers registered, or required to be registered, with the Securities and Exchange commission; futures commodity merchants and commodity pool operators registered, or required to be registered, with the Commodity Futures Trading Commission; and any similar entity, whether or not insured by the federal government.

Fairmont Funding, as described by its counsel, is a "private mortgage lender."[38] It is a private business entity that lends money. Although more reputable than, it is for §2B1.1 purposes functionally the equivalent of, the local loan shark. It is not described within, and it is not "similar to" any of entities described within, the statutes referenced in the Application Note

---

[38] Memorandum of Fairmont Funding In Support of Its Claim of a "Legal Interest," page 1.

18

definition[39] and it is not one of the entities specifically listed in the definition or "similar to" any of those entities. Because none of the Count Four loan proceeds came "from" a "financial institution," there can be no §2B1.1(b)(13) enhancement attaching to the Count Four Offense.[40]

## CONCLUSION

If the loss calculation under §2B1.1(b)(1) is $5,000.00 or less and there is no "gross receipts" enhancement under §2B1.1(b)(13), then Edelkind's offense level is no more than the base offense level − level 7. At offense level 7 and criminal history category III, the sentencing range

---

[39] The statutes referenced cover a substantial amount of ground but they describe specific, rather than general types, of entities. Title 18 § 20 covers federally insured depository institutions or depository institution holding companies; credit unions with accounts insured by the National Insurance Credit Union Share Insurance Fund; Federal home loan banks or members of the Federal home loan bank system; a System Institution of the Farm Credit System; a small business investment company, as defined under the Small Business Investment Act of 1958; a Federal Reserve Bank or a member Bank of the Federal Reserve System; an organization operating under section 25 or 25(a) of the Federal Reserve Act; or a branch or agency of a foreign bank. Title 18 § 656 deals with embezzlement or theft by officers, agents or employees of certain entities already identified in portions of § 20. It does not appear to add a description not already covered under § 20. Title 18 § 657 covers various federal agencies and "a Farm Credit Bank, a bank for cooperatives or any lending, mortgage, insurance, credit or savings and loan corporation or association authorized or acting under the laws of the United States, or any institution, . . . the accounts of which are insured by the Federal Deposit Insurance Corporation, or by the National Credit Union Administration Board or any small business investment company, or any community development financial institution receiving financial assistance under the Riegle Community Development and Regulatory Improvement Act of 1994." Title 18 § 1005 covers entities already described in §§ 20 and 656. Title 18 § 1006 covers the same ground as § 657 except that it adds "any Federal home loan bank," which was already included in § 20. Title 18 § 1007 refers only to the Federal Deposit Insurance Corporation. Title 18 § 1014 also covers some of the same ground as the preceding sections. It appears to add "production credit associations," "agricultural credit associations," "regional agricultural credit corporations established pursuant to law," "Federal land banks," "Federal land bank associations," "Federal credit unions," "insured State chartered credit unions," and any institution the accounts of which are insured" by various federal agencies.

[40] Edelkind continues to maintain that Aurora Loan Services and not Lehman Brothers Bank, FSB purchased the Linda Edelkind Note. Aurora Loan Services is not a "financial institution."

19


under the advisory guidelines is a Zone B 4 to 10 months.

        JAMIE EDELKIND

        By his attorney,

        s/ Michael J. Liston

        _____
        Michael J. Liston BBO# 301760
        2 Park Plaza, Suite 610
        Boston, MA 02116
        (617) 426-2281

July 5, 2005