# In the United States District Court
# District of Massachusetts

Jamie Edelkind                        |    Criminal No:  04-cr-10066-mel

      **Petitioner/defendant**    |    Judge: Morris E. Lasker

v                                     |

                    |    **Writ of Error Coram Nobis**

United States of America              |

      **Respondant/plaintiff**    |

---

## Defendants: Writ of Error Coram Nobis

The Petitioner, in this instant motion, now into court brings this motion for the purposes of alleging willful, and deliberate fraud and error by the court. Act. The petitioner, requests an immediate hearing on this matter, before the offending court. If the judge believes that he is incapable, in light of the serious allegations, to render an impartial and unbiased judgment, he may therefore recuse himself. Petitioner is _**NOT**_ (emphasis deliberately taken) repeate, _**NOT**_ represented in this action by counsel. The court must consider this petition on it's merits. It would be an exparte violation of the petioners 5th and 6th and 14th amendment rights for this court to entertain ignoring this motion based upon appellate counsel representation. Petitioner notes, that this court, in the past, has improperly ignored properly filed motions containing substantive issues in this manner, and that if this court does it again, absent the law, the petitioner will hold the person responsible for such tactics personally liabel. In any event the petitioner requests the court review the issues of fact and law presented herein and grant the relief as requested.

1

**Facts**:

### 1.

On July 12, 2005, Judge Morris E. Lasker, Senior U.S. District Court Judge, for the First Circuit, Boston Massachusetts, with fraudulent intent, and evil motive did direct a verdict of guilty upon Jamie Edelkind. Such signed entry of Judgment was in disregard of the jury's verdict rendered on March 8, 2005.

Acting without any lawful authority, Lasker did then sentence and cause Jamie Edelkind to be illegally detained, and suffer severe loss of reputation and property.

Morris Lasker had telegraphed his intention to harm Edelkind, during the course of the trial, by a variety of unethical conducts. Certain of these conducts while not illegal, were plain error or worse. However, his pattern of continuous predjudice culminated in an illegally directed verdict of guilt, and subsequent sentencing, reveal the illegal motive, and execution of Lasker's scheme and artifice to perpetrate a fraud, obstruct justice, falsely imprison, enslave, defame, and in other manners, do everlasting and permanent harm upon Edelkind and his family.

### 2.

**Lasker executed his scheme by;**

    a) causing Edelkind to not being afforded the opportunity to enter any plea to an information filed by the US attorneys office; and by

    b) refusing to arraign Edelkind, as required by Rule 10 of the Federal Rules of Criminal Procedure. Lasker refused to arraign despite the notice of the AUSA; and by

    c) refusing to grant an emergency pretrial motion that, filed by Edelkind, requested a continuance be granted. The granting of such request was

mandatory pursuant to the Speedy Trial Act - 18 U.S.C. § 3161 (c) (2) which provides for a 30 day trial preparation period; and by

d)   deconstructing the jury trial process by removing from the jury any duty for making a determination of guilt; and by

e)   placing Edelkind in great jeopardy of conviction, by his facially and callously incorrect procedural and law determinations; and by

f)   causing the jury to answer a series of questions on a special verdict form that was insufficient to indicate guilt or a finding of any cogniziable federal offense. Having, tautologically laid a foundation, Lasker personally created the edifice of guilt, by directing such a verdict; and by

g)   sentencing Edelkind in a manner absent law and reason; and by

h)   failing to ensure that Edelkind had food and sustenance through the course of the trial.


## Error, and Potential Criminal Allegations:

### 3.

The conduct described above is all in violation of the following specifically and respectively, enumerated statutes and constitutional provisions. Such conduct is not error and is not subject to the cloak of Judicial immunity, as the offenses occur out of a disregard and in contempt of Laskers duties of judicial office and in willful disregard of the consequences to Edelkind, the faith of the community in the judiciary, and the law.

> *Lasker did willfully, with intent, and forethought, commit the vice, and offense of attempting to influence jurors in violaton of his oath or office, the judicial canon's of ethics, and, specifically, in criminal violation of 18 U.S.C. §§ 1503, and 1504 (attempting to influence jurors by force or by writing respectively) of the United States Criminal Code. Such conduct in opposition to the protections afforded and*

3

*guaranteed by Article 3, amendment's 5, 6, 14, of the U.S. Constitution. The official record of the court reflects sufficent evidence of the foregoing and is herewith presented in sufficent detail to support the general allegations.*

*Lasker did willfully, with intent, and forethought, commit the vice, and offense of causing the illegal imprisonment and enslavement of Edelkind by fraudulently using his office and position to cause the entry of a fraudulent conviction and a fraudulent Judgment and Sentence, all in violation of his oath of office, the judicial canon's of ethics, and, specifically, in criminal violation of 18 U.S.C. §§ 1581 Peonage obstructing enforcement; 1583 Enticement into slavery; 1590 Trafficking with respect to peonage, slavery, involuntary servitude, or force labor; and 1201, Kidnapping. Such conduct in opposition to the protections afforded and guaranteed by amendment's 5, 6, 8, 13, and 14 of the U.S. Constitution. The official record of the court reflects sufficent evidence of the foregoing and is herewith presented in sufficent detail to support the general allegations.*

*Lasker did willfully, with intent, and forethought, commit the vice, and offense of fraud by signing, without legal authority or jurisdiction, a Judgment and Conviction which included forefiture and restitution in criminal violation of 18 U.S.C. §§ 1341 - Frauds and Swindles; 1343 - Fraud by wire, radio, or television; and 1344 - Bank Fraud, all of the United States Criminal Code. The official record of the court reflects sufficent evidence of the foregoing and is herewith presented in sufficent detail to support the general allegations.*

## Factual Allegations:

### 4.

In March of 2004, Jamie Edelkind, signed a three count information and was arraigned and released on personal recognizance. The information was, pursuant to Rule 20 of the Federal Rules of Criminal Procedure (the "FRCP") transferred to be the northern district of Georgia for resolution. Subsequently the information was transfered back to the first circuit for resolution.

4

**5.**

On October 4, 2004, Edelkind self-surrendered in accordance with a plea agreement out of Georgia to serve a 7 month remainder sentence. Edelkind, despite repeated letters, and phone calls, did not have any communication with his attorney, Robert Sheketoff, until the second week of February 2005.   At that time Edelkind, had finally been able to get Sheketoff on the phone. Sheketoff informed Edelkind that AUSA Levenson, the prosecutor in the first circuit case, was seeking to add an additional cout of wire fraud to the information.  Sheketoff wanted to know if Edelkind would agree to waive indictment in favour of an information.  Edelkind asked to be presented with a proposed information; but, agreed in principle to the benefit of proceeding by information.  It was the defense's understanding that the Government intended to add a single count of wire fraud against a private, out of state lender, for which there was no risk of loss.  Such an assumption suggested a probated sentence with a cap of 6 months if convicted pursuant to the USSG.

**6.**

On February 12th of 13th Edelkind again spoke to his attorney, Sheketoff.  During this phone call, Edelkind learned for the first time that a trial was scheduled for the 28th of February. Sheketoff said that he was finishing a murder trial, but that he would be done and come to see Edelkind with the new information the next week.  He further indicated that he would try to  mail a copy to Edelkind of the proposed Information.  Sheketoff again asserted that he believed the additional count was wire fraud.  Edelkind called his wife, and had her, through a different attorney, obtain the proposed information.  Edelkind received the content of this information, by phone from his wife. This was a proposed, not waived; but, still filed Information. This proposed Information was from the latter part of January. This Information was never signed, Edelkind was never arraigned upon it, and it was never further utilized, except, in some obscure way, to support a further superseding Information.

7.

Edelkind attempted to immediately contact Sheketoff, but was unable to reach him either at his office or on his cell phone, during the next 6 days. Desperate, Edelkind subsequently filed, pro-se, a motion in the court, alleging his lack of notice as to the charges, his lack of attorney contact, and general lack of perperation. Edelkind also served a copy of his motion upon the government as well as upon his own attorney, Sheketoff.

Subsequent to this mailing of the motion, Sheketoff did meet with Edelkind twice prior to the eventual trial. The first time for 45 minutes and the second time for 30 minutes. The second meeting by Sheketoff was not anything more than what Sheketoff termed a "social visit." Sheketoff did not bring the case file or any research at all. He merely told Edelkind what was going to happen at trial, the day after next, and that the Judge denied Edelkind's request for a continuance. Edelkind was frantic in expressing his concern for Sheketoff's obvious unfamiliarity with the issues and lack of preparation. Sheketoff assured Edelkind that he had the "rest of the weekend to bone up on the case." Edelkind inquired about the denial of his motion to continue, but Sheketoff told him that it was futile. "The Judge can deny your motion in his sole non-reviewable discretion."

8.

Edelkind directed Sheketoff to arrange for clothes and to get him a copy of the information. Sheketoff, said that there was no superseding information, until Edelkind signed it, but that it was only proforma. He did provide, at this time, a copy of the proposed information.

9.

On February 28th, Edelkind was brought before Judge Lasker. Edelkind was told to, and over his request to not so do, was compelled by his attorney to sign a waiver of indictment. AUSA Levenson, then requested that the court arraign Edelkind. Lasker ignored the request. Edelkind

6

attempted to speak with Sheketoff but was told to wait until the court recessed. During a momentary break, Edelkind was told by Sheketoff that the trial could not commence until he was arraigned and that he would then renew a request to continue the trial date for 30 day's.. He also said that Lasker could reduce that time significantly, if he found that it was unneccesary to provide the full 30 days for the defense to prepare.

#### 10.

Despite this reassurance, Lasker then proceeded to send for the potential juror's. Edelkind was therefore, never arraigned on any of the offenses charged in the Information upon which he was tried. He never entered a plea, he never was given an opportunity to examine, or prepare a defense. For at least the forfeiture and one count, he did not even know of the allegation's until the day of trial.

#### 11.

After the jury was empaneled, Lasker dismissed the now sworn jury, and confirmed that trial would commence on the following day. Edelkind had Sheketoff ask Lasker to order the detention facility, that was holding Edeelkind, to comply with his religious dietary requirements and serve him Kosher food. Sheketoff also informed Lasker that Edelkind had received no food at all for the past 3 days. Lasker agreed that he would ensure that suitable kosher food was provided. Notably, despite repeating this request through March 8th, Edelkind never received any food, and was informed that no such order had been executed or orally assigned. It was not until March, 8th 2005, that Lasker finally told the U.S. Marshal to provide a vegeterian sandwich. The U.S. Marshal attempted to argue, but Lasker firmly ordered them to comply. At this point, Edelkind, had been starved and thus severly weakend during the entire course of the trial proceedings.

7

**12.**

During the course of the trial; the prosecution introduced, over objection, a portion of Edelkind's "guilty plea" from Georgia.  The portion introduced, specifically referenced the information as to Edelkind's intention to plead guililty to the Information pending in the first Circuit.  Lasker permitted the introduction of the plea component in violaton of Rule 20 (c).  The introduction of the plea component violated Edelkind's 5th Amendment right against self-incrimination and completely biased the jury into a predisposition to convict.  To the extent that the plea agreement required the language of "intending to plea guilty" Edelkind was not apprised of his miranda rights, and informed that, inspite of the Rule 20 (c) provision "..The defendants statement that the defendant wished to plead guilty or nolo contendere is not in any civil or criminal proceeding admissable against the defendant" it could still be used against him, notwithstanding.

**13.**

Lasker, presumably compes-mentes, knew that the admission of this plea component served as a virtual confession.  Lasker clearly intended that the jury know of Edelkinds previous plea, and presumptially the non-rebuttable confession.  In any affirmative rebuttal, Edelkind would be inviolation of the plea agreement if he repudicated it in any manner.  Further, in order to repudiate it Edelkind would have to take the stand and having so testified, be open to explore the mnanner and subject matter of the plea itself.  All in violation of Edelkind's right to not have the jury be made aware of his previous conviction and his 5th amendment right's.

**14.**

At points, during the course of the trial, Lasker took judicial notice of matters not within his expertise of law.  He , by doing so, rendered any attempt to allow the defense to attack the prosectuions evidences futile.  Specifically by way of example, Lasker commented upon, in the presence of the jury, without inquiring of counsel, and compelled the jury to accept as factual, that certain tax documents were fraudulent.  Such documents were central to the prosecutions case.

Such judicial notice destroyed any potential defense, that would suggest that any mistake on the tax forms could have resulted from error as opposed to fraud. Edelkind would have had to test the judges credibility to overcome the administering of "Judicial Notice." Such efforts would have been impossible and too risky to even contemplate. Edelkind asked his attorney to request a mistrial. Sheketoff refused, without stating any reason.

## 15.

In chambers and sidebar conferences on the record. Lasker refused to honor Sheketoff's request for a "guilty/not-guilty" verdict from the jury. Lasker on his own, but with the approval of the government, and over the objection by the defense, decreed that the jury be given instructions to deliberate over a series of special questions that he created. Conspicuously absent was any general verdict of guilt or not guilt as well as two of the four essential elements of the offense In this case the counts were distinct and there were no sentencing factors for the jury's consideration. Further, there were not any potentially alternative theories formulated for the jury to select among that a special verdict form would assist in ensuring unanimity as to the foundation for a general verdict. The impremissable, but obvious function of this "Special verdict form" was to lead the jury into fact finding that could be misconstrued as a conviction, but an invengled chatechism. As the record reflects, this is precisely what occured.

## 16.

Read on it's fact the jurys' verdict fails to specify an offense as to any charges, much less so those alleged in the information. The special verdict could merely be stated to suggest that Edelkind was unanimously agreed to have done only two, out of the four things or acts necessary to be convicted.

The two not-found acts are defined as "essential elements." Had the jury been asked to render a general verdict, along side the special verdict interrogatories; at least one would presume

that the jury, considering the charging instructions as a whole, found the elements in rendering a general verdict of guilt.

### 17.

Lasker was not merely content to "lead the jury down the guilty trail," he wanted to remove all possibility of them leaving the trail, and find an acquittal. Upon receiving the special verdict form. Lasker had the foreman of the jury answer a question as to the judges uderstanding of the import of the interrogatories. The nature of his poll of the foreperson, as to the foreperson's multi-part syllogistic understanding was both leading confusing and tautological. It would have been a superior intellect and will, that could have resisted Laskers compulsion to answer in the affirmative.

The polling question and preamble statement, repeated verbatim herein, as taken from the official record:

*Lasker*

> *"As I read it; your verdict, your answer, whether you find the defendant guilty, is 'yes'. Am I Correct?"*

*Foreperson*
> *"Yes."*

### 18.

The only question that the foreperson responds to is Lasker's query; "Am I correct?" But this affirmation is not answering the question that is required by law. It is merely a polite, politic catacheized, respectful affirmation, and validation of the judge's ability to control the application of the law. The response was given without thoughtful pause to even consider what the breadth of the conclusion the "yes" might refer to within Laskers compound statement. If there was a general verdict of guilt, this question would not be quite so problematic. But read in the acknowledged

absense of such a general verdict, there is no rationale to draw any conclusion of guilt either from a jury finding or from the law. Merely, it is the impermissable judicial direction of a gulilty verdict by Laker that is in evidence.

### 19.

This statement and question must be combined and then set out individually as to objective construction to even determine what is being asked. First analysis of the the actual jury finding sets the stage for the poll. The jury interrogatory indisputably only encompasses the finding of two essential elements, out of the four required for construing the offense alleged. The jury was, in essence, instructed to having found those two elements, answer "yes" on the special verdict form. Such an affirmative response did nothing to suggest the jury could distube the state of defendants innocence as a matter of law. Therefore, Lasker could not lawfully state "As I read it.." As one reads a verdict is how everyone must read a verdict. A verdict "is to speak the truth" not to give credance to ones personal perspective. The truth stands on it's own, it needs no interpretation fulfilling perspective of a biased judge. The very use of the phrase "As I read it" calls into question the veracity of all that follows. Simply put, the jurys "Verdict" standing on it's own is not a guilty verdict.

### 20.

Presumably Lasker, who instructed the jury, knew of and contrived to maintain the deficiency in the special verdict answer. Certainly though, he absolutley knew, upon review of the jurys special verdict form, that the verdict did not contain any indicie of guilt. His statement "As I read it..." indicates that he was aware that it was his personal interpretation that created guilt. This reasoning is inescapeable since any other person, lay or otherwise, would call the jury's verdict an acquittal since it factually fails to find any cogniziable crime. The jury's finding, read on it's face would be inadequate to even support a civil fraud consideration, much less that of criminal liability.

### 21.

Recalling that; the unanimous answer of the jury, to each of the four questions on the special verdict form, was only permitted to be a simple "yes" or "no." Also, significantly, Lasker deliberately instructed the jury to deliberate over the special verdict form questions. He never instructed then to deliberate over or find a verdict of guilty or not. It is obvious that Lasker as a "Senior Judge" was completely aware that no lay juror could resist his compulsion to anwer in the affirmative upon being thus polled. Had he said "As I read it....Not Guilty" there can be little doubt that the forman would have still said yes, just as assuredly and quickly.

### 22.

Further analysis of Laskers question is even more problematic. His authority was not to interpret the verdict of the jury; but to merely accept it and cause it to be entered. Lasker's question, to the jury foreperson, was not a question that could have been answered differently. It was carefully construed to preclude any other response. The three part disjunctive-object sentence, required a skilled legal competancy to even evaluate what it asked, much less what the answer might be. Only in retrospect can Laskers machinizations be realized in it's underhanded, biased, self-serving, unconstitutional, and illegal entirety.

*Restated Again :*

> *The polling question and preamble statement, repeated verbatim herein, as taken from the official record:*

*Lasker*

> *"As I read it; your verdict, your answer, whether you find the defendant guilty, is yes. Am I Correct?"*

*Foreperson*

> *"Yes."*

12

The foreperson was left with only one legitimate option in answering the question, and that was in the affirmative. To do otherwise would have requred that the foreperson make a legal determination counter to that of the judge. The foreperson, relied upon the notion that the judges supplemental interpretation, and affect of their verdict, equated to guilt. Such reliance was predicated on the knowledge of their duty to have the judge instruct them in the law. That the judge would be inconsistent, capricious, wrong, or fraudulent, was not within their pervue to imagine much less to then evaluate. Both the government, and the defense told the jury that only the judge could instruct them as to their duties and, more importantly, the law. I would have been presumtively impossible for the foreperson to distinguish the "Yes" verdict, found through unanimity, from a guilty verdict. The jury foreperson thus enthralled to Lasker as a figure of authority and judicial propriety, was tautologically compelled to answer affirmatively.

### 23.

Breaking the three predicate, four object, compound, and multipart question down to a concise system of queries, illustrates an adept, but legally suspect cajolery. Lasker, with prestilingual suaveness, besting any anecdotal used car salesman, conjured a guilty out of thin air. In a feat rivaling all he conned everyone. His hubris dares any challange.

### 24.

Deconstructing the query to the foreperson into independent compound questions illustrates the problem best. There are twelve required questions necessary to encompass the full complement of queries posed by Lasker. Enumerated in completely adequate construction in fidelity to his single compound question; they are:

*a1. Am I correct that your verdict, as to count "1," is "Yes"?*

*a2. Am I correct that your answer, as to count "1," is "Yes"?*

a3. *Am I correct that your finding as to whether the defendant is guilty as to count "1," is "Yes"?*

b1. *Am I correct that your verdict, as to count "2," is "Yes"?*

b2. *Am I correct that your answer, as to count "2," is "Yes"?*

b3. *Am I correct that your finding as to whether the defendant is guilty as to count "2," is "Yes"?*

c1. *Am I correct that your verdict, as to count "3," is "Yes"?*

c2. *Am I correct that your answer, as to count "3," is "Yes"?*

c3. *Am I correct that your finding as to whether the defendant is guilty as to count "3," is "Yes"?*

d1. *Am I correct that your verdict, as to count "4," is "Yes"?*

d2. *Am I correct that your answer, as to count "4," is "Yes"?*

d3. *Am I correct that your finding as to whether the defendant is guilty as to count "4," is "Yes"?*

## 25.

Had any lawyer, at trial in Lasker's Court, attempted to package a leading compound question in a similar manner to the one popounded to the foreperson, to a witness, Lasker would not have permitted. Such a question is as a duplicitous device and any answer is of no quantum of value. How much higher the standard for determining the singular fate of a defendant can forebearance demand? Is it too much trouble to ask that the jury say guilty or not? Why the needless obfuscation? The answer is plain. Behind elegant words still resides colloquial meaning, but the meaning may be obscured by the forest of symantics. Lasker counted on the purloined letter artifice. Hide what you do in plain view, but surround it by seeming skill and deftness of word craft, and no one will suspect your conniviance.

**26.**

But still the analysis is not complete. Had the foreperson been queried individually as to the deliberation result of the jury, only the series of question's posed according to style x2, ante, could have been answered affirmatively. A "yes" answer to x2 is also factually correct and a consistent response. It does not require or permit the foreperson to resolve any ambiuity or vagueness. A "yes" response to style x2 is consistent only with an acquittal not a verdict of guilty as shown earlier.

**27.**

Also, style x1, ante, could, with just a linguistic and generic legal understanding, be answered in the affirmative, without disturbing the innocence of the defendant. However, even this style pose's a potential problem. Having been instructed, by Lasker, to only deliberate over the question's and answer them, without having been instructed what is significed by the answer's, there is no legal basis to presume what actually and legally comprises the "Verdict."

**28.**

It is indisputable that adopting the question and corresponding "yes" answer into a statement could be construed to be a legally competent verdict. However, such construction renders the defendant acquitted, since the factually found statement does not state a cogniziable offense, nor does it even reference the citation of offense alleged in the indictment. Therefore, pertimitting that the foreperson, soundly, did such understand the construction of the question, she would have answered affirmatively to style x1 also. This answer too is only conistant with an acquittal. No competent, sane jurist could construe that such a verdict is possibly coexistent with a "guilty" finding. But, equally possible the verdict is just the single word "yes."

## 29.

The style of x1, ante, is correct, but linguistically does "answer" equal "verdict"? Possibly, if the construction would only permit such a reading. But in this case an answer of "yes" to a question is certainly more broad than simply a "yes" on it's own. Had the "yes" shown agreement to a statement it certainly would be sufficient. Consider the following example (not an actual example)

a.     *We the jury find the defendant "guilty." Do you so find?* <u>*YES*</u>

*versus*

b.     *We the jury find the defendant "guilty." If you so find enter "yes."*

<u>*"YES"*</u>

Such a verdict in either example would indisputably signify that the jury finds the defendant guilty. Further, it would be an appropriate rendition for any jurist to suggest that the verict is "guilty." However, asking the jury what their "verdict" actually is still a problem. A valid response might be in "(a)" a simple "YES." Just allowing the finding to be posed as a question treads periously close to requiring that the judge determine what actually comprises the verdict itself. It should not be permitted for the jury or the judge to mistake what the verdict may entail.

## 30.

It is axiomatic that a judge may not direct a verdict of guilty, although he may as a matter of law, direct an acquittal. Insofar as a jury's findings or verdict he may only accept them on their own. No one, not even the judge or the jury foreperson may interpret them. The Verdict must speak for itself. It represents the unanimity determination of veniremen not subject to be second guessed. The very statement by Lasker of "As I read..." personalizes the entire series of polling question. In affect, he is instructing the jury to follow his reasoning, not requesting the the jury render their's. The entry of the Jury's verdict by the judge is supposed to be a purely ministerial

act. He is not permitted to add anything to it, modify it, or in any way read it out of context. He must merely enter it on the record. In this case the record reflects that Laker acted as a venierman and not a judge. He deliberately and with premeditation, rendered the clear protection of the constitution into so much confetti.

### 31.

Style x3 is not only leading, conclusionary, erroneous,and malicious; it also calls for a legal conclusion by the foreperson in open court, for a matter not deliberated by the jury. Lasker did not instuct the jury to consider the defendants guilt, he did not instruct the jury to consider the defendants guilt. Lasker did not instruct them to consider the two missing elements. He further did not instruct them that a "yes" answer could only be made upon a unanimous determination of guilt. He further did not instruct the jury as to the import of a "yes" answer. Recognizing that deliberations must be private, sequestered, with participation of all jurors, without the introductionm of any suggestive or leading compulsion by any party, especially the trial jduge; one must question the motivation of Lasker to deliberately violate each and every one of these bedrock precepts. Further, having already instructed the jury that they may not interpret law, that being the sole province of the court, Lasker by the style of x3 requires the foreperson to do just that.

### 32.

The foregoing, of couse, presumes that the jury foreperson actually had such intellectual horsepower under her control, and was able to birng it to bear in the 0.6 seconds between Lasker completing his compound question and her reply. Given the complexity and infirmities of the style actually used, it is reasonable to believe that the foreperson, who was randomly assigned by virtue of her seat without regard for any special skills, answered "yes" as a purely reflexive catechism in deferance to Lasker's imposing presence as Judge. The "yes" by the foreperson, was a respectful indulgence to the question posited by Lasker's; "Am I correct?" The subtle nuances involved that

remain necessary to make sense of Lasker's improper compound assesment and question, are only apparent in retrospect.  This was no accident!

### 33.

The use of special verdict forms is only reluctantly, and rarely available, and then only for special reasons.  Also, special verdict forms must include the explicit finding of guilt, either embedded in the special verdict itself, or as a seperate general verdict.  Lasker has, in this case, risen to a new low in judicial malfeasance.  He insisted on this unique application of a special verdict form, for no other conceivable reason then to reserve the the finding of guilt for himself. He demeans the Framers fundamental reason's for imposing a constitutional aegis against just this example of oppression and moral prudery.  Lasker criminally, mocks this historical unwavering exemplar of liberty and freedom of oppresion.

### 34.

Lasker's legacy regarding abrogaton of a defendants jury rights, will, if not quickly and remedially resolved, infamously taint jurisprudence for years to come.  It will serve to establish an everlasting metric for just how much of a defendansts rights can be done away with by judicial fiat.  Yet, as if this was not bad enough; Lasker, having directed a verdict of guilty, address's counsel for Edelkind and commends's him for doing an admirable job.  This despite Lasker observing that Shecketoff, failed to even put on a defense case or even make an opening statement. Laskers solicitude was merely a pavlovian treat to satisfy the sycophantic responses of counsel. Perhaps it is too generous an assesment of Laskers intellect, to consider that this might have been calculated to preclude a zealous and diligent effort on behalf of Edelkind, by Sheketoff in preventing the meretritious conduct of Lasker.

**35.**

However, the record proves that Laskers pattern of abuses, in this calculated judicial scheme to obstruct justice, was not yet complete. Edelkind, immediately ask that Sheketoff request that he be allowed to return to the camp at Ft. Devens to complete the remainder of his sentence, and be allowed to seek release pending appeal when done with the balance of the Georgia sentence. Lasker, on the record, agreed to order Edelkind be restored to Devens and that Edelkind could susequently seek release at a later date. He did order, at the request of the prosecution, that Edelkind not be released to a half-way house or out of detention unless the court so ordered. Lasker agreed to reserve Eelkinds right to seek release. However, on March 18th 2005, Lasker ordered, without a hearing, that he for reasons not given rebut opportunity at a hearing, that Edelkind was detained. Edelkind was therefore continuously denied relief from this on going illegal incarcration from that point onward. Edelkind, after one week of waiting for Sheketoff to come speak with him, and for transfer to the camp at Ft. Devens, elected to terminate Sheketoff's representation. In significant part this termination election was motivated from the all too casual approach Sheketoff took to defending Edelkind's interests and discussing the case with Edelkind. Edelkind, sent such termination by mail to the court and to Sheketoff.

**36.**

One additional week passed during which Edelkind remained in a high security detention center. Subsequently, Lasker reversed his agreement to order Edelkind back to Camp Devens and thus caused him to be further illegally detained in a facility inappropriate to the demeanor of his alleged offense, bank fraud, for which he was tried (but not convicted). Edelkind was brought to court to have Sheketoff removed as Counsel. Edelkind requested the appointment of a court compensated attorney due to his indigence. After hearing Edelkind's request to remove Sheketoff and find replacement counsel, Lasker permitted Sheketoff to be excused.

**37.**

Lasker, then, on the record, and as a deliberate public insult to Edelkind, suggested that Edelkind would be guilty of perjury if he lied on a financial afidavit that needed to be completed prior to approving court funds.   Such admonition is in black and white on the doucment itself and Lasker only took the opportunity to lash out at Edelkind in a spiteful manner. Lasker, demonstrated a predisposition of moral indignation against Edelkind despite the complete lack of any allegation or otherwise that Edelkind ever lied under oath or attempted to deceive the court.  Ultimately, Michael Liston was selected to replace Sheketoff, for sentencing.

**38.**

In the course of coming up to speed, Liston met with Edelkind on many occasions. Together, they determined that the pending forfeiture matter was defective.  Liston, on Edelkinds behalf filed a motion to dismiss the pending forfeiture allegation.  The motion alleged mis-citation, and mis-pleading of the essential matters to comprise the standard of "criminal forfeiture" replete with factual infirmities and facial deficiencies. Lasker, after reviewing the governments response, failed to obey the law, failed to give reasons, and failed to even comport the interest of the parties and without a required hearing pursuant to Rule 32.2 (b)(1), entered a preliminary order of forfeiture. Edelkind sought vacatur of the order and directed Lasker to the Rule.  Laskers response was to ignore the motion to vacate and instead enter an enhanced order of forfeiture further in violation of the Rule.

**39.**

But still, Lasker was not done.  At sentencing, Lasker ignored black letter law, and applied an enhancement ot Edelkind's sentence that effectively mooted any argument for lack of victimization. The enhancement was not factually applicable under any burden of proof, since the elements required for the enhancement were never established and in fact were proved otherwise. Further, in accordance with the requirement of the U.S. Sentencing Guidelines Chapter 2 § B1.1

(b)(13)(A), Lasker was required to find that the amount of money that Edelkind individually derived from any one of the charged offenses had to exceed one million dollars. Such finding had to infact asess such monies in a strict accounting, exclusive, upon allegation and proof, to Edelkind. Liston noted this to Lasker who replied that he could treat the requirement as a joint proceeds under a conspiracy without regard to whether Edelkind received any funds or not. Liston vociferously objected and cited case law and examples from the USSG. Lasker again stated he was tired and to let the appeals court fix it.

## 40.

The difference to the sentence was that of probation versus seven years imprisonment. It rendered all other sentencing considereations moot. Lasker announced that he was applying the enhancement any way. Lasker never determined what money if any came from a financial institution, much less if such money was more than one million dollars to Edelkind personally. This is spelled out in black letter law with accompanying examples. Furthermore, cited precedent clearly instructed as to the procedure. No argument was availing. Lasker said he could do what he wants, and he did. Lasker crafted fully new law to apply this enhancement. It was not misreasoned or error. It amounted to a deliberately draconian, and punative largess.

## 41.

Edelkind, prior to sentencing, allocuted to Lasker, a virtual shopping list of extra ordinary errors that were apparent at the time. Lasker after allowing Edelkind to finish speaking, which comprised a 40 minute recitation and request to rectify the errors through generous remedy at sentencing, did instantly pronounce sentence. Laker indicated that he had pre-prepared his sentence prior to hearing out the parties. This rendered moot the whole final day of the sentencing, from a standpoint of averments and arguments. His sentence, laser printed for him to read from, sentenced Edelkind to 60 months incarceration and other punative issues.

## Conclusion:

### 42.

Both Sheketoff and Liston had continuously brought certain inconsistancies to Lasker's attention. Lasker as was his demeanor, throughout the whole trial, demurred saying, (variations on) I am tired, take it up elsewhere. A trial _is_ the forum to get it right. Errors can, and do creep in unnoticed, or misreasoned. However, diligence and vigilance are necessary to keep any validity in the court proceeding. The appellate level review gives great deference to the trial court in it's presumed dutiful exercise of its purvue to minimize error. If the trial court does not seek to have it's decision balanced, rooted in the interests of maintaining the rights of the parties, the appellate level has only a limited mandate to correct. In it's review of what happened below, it will not evaluate the error on it's face. The trial court must or it will not get done at all. The appeals court will evaluate the error only under the presumption that the trial court was probably correct, and if not correct, the error is likely to be harmless. A trial court knows this. Lasker is counting on it.

### 43.

Lasker on July 12 2005 signed a fraudulent "Judgment in a Criminal Case," Having never been given the authority to enter such, Lasker has, with complete abandonment of his oath and duties and in abuse of his office, stepped outside the protection of his office. Edelkind notes that immunization of a judge is to that done in the execution of his lawful duties. When a judge deliberately misuses his office to oppress an individual, he affirmatively by his actions waives any conscriptive protection of said office. Lasker, to the extent his vice is one of error, mental defect, mental infirmity, or mere laxity of duty is and should remain immune from prosecution or civil remedy. However, to the extent that it appears that his meretritious conduct is found to be malicious in genesis and execution, he foregoes that aegis. A public official or minister is a best definition of the ambiguous sinecured position occupied by a federal judge. When he is found to have damaged society's faith and confidence by intefereing in the proper administration of justice, his penalties should be most severe.

**44.**

Lasker should be made an example to all.  He should be held to a high standard and punished adequately to deter those who follow, and to restore the public's confidence in justice.

**Prayer:**

**45.**

Petitioner respectfully requests that this court makes such findings as necessary, and in comportment thereof, nullify and void the Judgment and Sentence wrongfully inflicted upon the Petitioner.

**46.**

Upon nullification and voiding of the Judgment and Sentence, that the court immediatley order the release of the Petitioner from custody, with full restoration of his rights.

**47.**

If the court request oral argument or briefing on any issue raised herein, the Petitioner is prepared to respond quickly.  However, the matters herein are of such fundamental nature that the Petitioner avers that the court can rule upon them directly.

**48.**

This Writ is necessary to support any further relief at a higher court.  If this court fails to grant the relief requested by the Petitioner, it is necessary to demonstrate that the trial court had the notice and opportunity to correct these glaring errors of constitutional dimension, and respond accordingly.  It is the fervent wish of the Petitioner that such action will be precluded by the court acting in a reparatory, rightous and just manner.

**50.**

Petitioner, notes that he is without resources to collect and copy the entire transcript of the trial court proceedings to attach hereto. If the court requires a full briefing, the Petitioner requests that the Court order the clerk to send to the petitioner, a full evidentiary and trial transcript in duplicate.

Respectfully Submitted for the Petitioner, this the 1st day of June, 2006:

Jamie Edelkind, pro-se:
c/o SMPCC
437 West Mills Ave.
Breaux Bridge, La. 70517