# United States Court of Appeals
## For the First Circuit

Nos. 05-2125, 05-2228

UNITED STATES OF AMERICA,

Appellee,

v.

JAMIE EDELKIND,

Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Morris E. Lasker,* Senior U.S. District Judge]

Before

Boudin, Chief Judge,
Torruella and Dyk,** Circuit Judges.

Michael J. Liston, by appointment of the court, for appellant.
Paul G. Levenson, Assistant United States Attorney, with whom Michael J. Sullivan, United States Attorney, and Kristina E. Barclay, Assistant United States Attorney, were on consolidated brief for appellee.

October 31, 2006

*Of the Southern District of New York, sitting by designation.

**Of the Federal Circuit, sitting by designation.

**BOUDIN, Chief Judge.** Jamie Edelkind was convicted of four counts of bank fraud directed against federally insured banks, 18 U.S.C. § 1344 (2000),[1] and he now appeals. The story can be briefly told, reserving details for our discussion of specific issues raised on appeal. So far as those issues concern sufficiency of the evidence, we set forth the facts assuming that the jury resolved credibility disputes and drew inferences in the government's favor. United States v. Romero-Carrion, 54 F.3d 15, 17 (1st Cir. 1995).

Facing bankruptcy in the summer of 2000, Edelkind concocted a false resume for his stay-at-home wife Linda, forging documents to make her appear to be a well-paid executive in a (sham) technology company he called "Apostille, Inc." Using the forged documents, Edelkind convinced a lender, America's Moneyline ("Moneyline"), to extend a mortgage of $800,000 in Linda's name in order to purchase the former "Honey Fitz" mansion in Hull, Massachusetts.

---

[1]Section 1344 makes it unlawful, inter alia, to "knowingly execute[], or attempt[] to execute, a scheme or artifice . . . to defraud a financial institution . . . ." For reasons explained in United States v. Brandon, 17 F.3d 409, 424 n.11 (1st Cir. 1994), the term "financial institution" is read restrictively in light of another definition, 18 U.S.C. § 20 (2000), confining the statute's reach to certain types of financial institutions including banks that are "federally insured." Brandon, 17 F.3d at 424. The statute also makes it unlawful to deprive a financial institution of property by reason of fraud but the parties have focused upon the defrauding provision.

Edelkind then repeatedly refinanced the Hull property for larger and larger amounts, each time paying down outstanding previous loans and retaining the surplus or "cash out" amount. He persuaded lenders to extend the loans on the basis of false representations and fabricated documents, including tax forms, showing Linda to be earning from $200,000 to over $1 million per year. Specifically:

> •In September 2001, Edelkind refinanced the Hull property by securing a $1 million mortgage in Linda's name from South Shore Savings Bank ("South Shore"), a federally insured lender. He retained $143,781.53 after paying down the Moneyline loan.

> •In spring 2002, Edelkind used the property as collateral to obtain several home equity loans in Linda's name, including a $350,000 line of credit from Wells Fargo, a federally insured bank.

> •In March 2003, Edelkind refinanced the Hull property again, this time with a $2.1 million mortgage in Linda's name from Washington Mutual Bank ("Washington Mutual"), another federally insured bank. He retained $205,370.29 after paying off South Shore, Wells Fargo, and other lenders.

> •In August 2004, representing that Linda's income was $1.1 million a year, Edelkind obtained a $3.3 million loan through Fairmont Funding ("Fairmont"), a non-federally insured mortgage broker, which funded the loan with the approval of Aurora Loan Services ("Aurora"), itself a subsidiary of Lehman Brothers, a federally insured bank. Lehman Brothers later purchased the loan. Edelkind used the proceeds to pay off the Washington Mutual loan and an additional $356,242.38 that had been run up on the Wells Fargo credit

-3-

line, leaving him with $569,878.83 in cash
surplus.

Remarkably, the last of these loans was secured after the
government in March 2004 had filed a three-count information
charging Edelkind with bank fraud in connection with the loans from
South Shore, Wells Fargo, and Washington Mutual.  In early November
2004, Linda and her children fled to Norway.  Approximately
$273,000 was wired to Norway and $47,000 withdrawn from ATMs in
Massachusetts and Norway between August and December 2004.

In February 2005, the government filed a superseding
information adding a fourth count directed to the Fairmont
transaction and including criminal forfeiture allegations under 18
U.S.C. § 981(a)(1)(C) (2000) and 28 U.S.C.A. § 2461(c) (West Supp.
2005) (subsequently amended 2006).  After a jury trial later that
month, the district court entered a judgment of conviction on each
of the four counts.  In June, the court forfeited the Hull property
and two bank checks deemed to be funds derived from the offenses.
In July, Edelkind was sentenced to 60 months in prison and ordered
to pay restitution.

Edelkind's first claim on appeal is that no proper
verdict of conviction was ever returned by the jury.  Instead of
having the jury return a written verdict of "guilty" or "not
guilty" on each count, the district judge submitted to the jury a
four-part form whose first question asked the jury to say ("yes" or
"no") whether they "unanimously find that the government has proven

beyond a reasonable doubt that Jamie Edelkind knowingly executed or attempted to execute a scheme to defraud" South Shore.   The form then asked the same question as to Wells Fargo, Washington Mutual, and Fairmont, respectively.

The jury returned a written verdict of "yes" on all four counts.   The judge then asked the foreperson, "As I read your verdict, your answer, whether you find the defendant guilty as to Count 1, is 'yes'; on Count 2 is 'yes'; on Count 3 is 'yes'; and Count 4 is 'yes.' Am I correct?" The foreperson responded, "Yes." Defense counsel declined the judge's offer to poll the jury and also did not inquire whether the jury intended its verdict to be one of "guilty" on each count.

Although we have not adopted a flat rule against special interrogatories in criminal cases, they pose special dangers. See, e.g., United States v. Spock, 416 F.2d 165, 182 (1st Cir. 1969) (progression of special questions can exert judicial pressure on jury).   They also sometimes offer benefits, notably in very complex criminal cases, where they can reduce risk of juror confusion. See, e.g., United States v. Palmeri, 630 F.2d 192, 202 (3d Cir. 1980).   The present appeal better illustrates the dangers than the benefits.

Edelkind's broadest claim is that no guilty verdict was·delivered by the jury on any of the counts.   The form did not in terms ask whether Edelkind was guilty, and his appellate counsel

-5-

suggests that the foreperson's response when questioned by the trial judge was ambiguous. Counsel posits that the foreperson might have meant only that the "yes" lines had been checked--not that the jury had intended to find Edelkind "guilty" of the offenses specified in the indictment.

Nothing in the rules requires a written verdict at all. See Fed. R. Crim. P. 31. Here, there was a written verdict which, if ambiguous, was clarified when the judge asked whether the defendant has been found "guilty" on each count. The lack of any objection when the foreperson answered and the judge proceeded to enter a judgment of conviction shows that trial counsel had no doubt that the jury had equated its verdict with guilt. There was no error, plain or otherwise, in treating the verdict as one of guilty on each count.

A narrower version of the argument, also made on appeal, has more bite. Edelkind points out that the phrasing of the verdict form itself omitted, for each count, an element of the statutory offense--specifically, that the defrauded institution be one that was federally insured. This is itself an example of the problems with using detailed verdict forms rather than simply asking whether the defendant was guilty of the offense charged.

Nevertheless, we conclude that there was no prejudicial error in the omission of the federally insured requirement from the verdict form. Special verdicts are not required in criminal cases,

-6-

and, when they are used, there is no automatic requirement that a special verdict form include every element of the offense so long as the jury is instructed as to all elements.  See, e.g., United States v. Stonefish, 402 F.3d 691, 699 (6th Cir. 2005).  Here the jury was specifically instructed that they "must be convinced beyond a reasonable doubt" of each of the four elements of the offense, including (as one of the four elements) that "the financial institution in question was federally insured."

          The defendant's next argument is that the verdict form and the jury instructions charged him with defrauding Fairmont and not with defrauding Lehman Brothers, and that he could not properly be convicted of defrauding Fairmont, which was not a federally insured institution.  The district court's initial jury instruction (which was given orally but later provided to the jury in written form) described count 4 as charging Edelkind with executing "a scheme to defraud . . . upon Fairmont Funding, LTD, which [is a] financial institution."  The special verdict form submitted to the jury asked, as to count 4, whether the government had proved

> a scheme to defraud Fairmont Funding, LTD in connection with a loan . . . originated by Fairmont Funding, LTD, and subsequently assigned to Lehman Brothers Bank, FSB.

          Just before the court read the jury instructions and provided the jury with the special verdict form, Edelkind filed a motion for judgment of acquittal arguing that "Count Four is entirely dependant on Fairmont Funding [and] the Government has

-7-

failed to prove federal jurisdiction" because Fairmont is not a financial institution under 18 U.S.C. § 20. The basis for defense counsel's motion was that Edelkind had to <u>know</u> that a "financial institution" would be the ultimate victim of his fraud. The district judge rightly found this position to be at odds with <u>Brandon</u>, 17 F.3d at 425, and rejected the motion for acquittal.

After the instructions were read to the jury, defense counsel orally objected to them and to the verdict form on the ground that Fairmont was not a financial institution, and reiterated his position that Edelkind needed to know that a "financial institution" would be injured. The court then provided a curative instruction stating that "Lehman Brothers but not Fairmont was a financial institution." Since the court had already told the jury that a financial institution had to be defrauded or deprived of money by fraud,[2] the jury <u>was</u> informed that it could not convict on the theory that the defendant had defrauded Fairmont alone.

It is quite true that the curative instruction came late in the day and apparently Edelkind's counsel did not ask for a

---

[2]The instructions required that the jury find that Edelkind executed "a scheme or artifice (1) to defraud a financial institution or (2) to obtain any of the money . . . under the custody or control of a financial institution by means of false or fraudulent pretenses." The court specified that "scheme to defraud a financial institution" meant "any deliberate course of conduct by which someone intends to deceive or cheat that financial institution and to obtain – and intends to obtain something of value, such as money."

transcript page reflecting it to accompany the original written instructions sent into the jury room; but the curative instruction was virtually the last instruction that the jury heard before retiring. Nor was defense counsel entitled to have the jury ignore the fraud upon Fairmont; on the government's theory of the case, false representations to it were the instrument by which money was secured from Lehman Brothers.

The question then becomes whether the jury was adequately advised that it needed to find fraud on Lehman Brothers. In this respect both the verdict form and the instructions were deficient. The verdict form made only passing mention of Lehman Brothers as having acquired the loan. While the "cured" instructions generally required a finding that a financial institution had been defrauded and that Lehman Brothers was a financial institution, the instructions failed to specifically identify Lehman Brothers as allegedly defrauded.

Edelkind did not request revision of the verdict form or an instruction that, in order to convict on count 4, the jury had to find that Lehman Brothers was defrauded. Indeed, Edelkind's counsel objected (unsuccessfully) to any mention of Lehman Brothers in the supplemental instruction. Counsel had good reason to direct attention away from Lehman Brothers; but Edelkind was surely on notice that the government's own theory of the case was that Lehman Brothers had been the victim of the fraud (albeit indirectly)

-9-

because the fraud on Fairmont had operated to deprive Lehman Brothers of its money.[3]

Under these circumstances, we conclude that Edelkind's failure to object to the instruction and verdict form as omitting Lehman Brothers makes those errors reviewable only for plain error. Fed. R. Crim. P. 52(b); United States v. Newton, 891 F.2d 944, 949 (1st Cir. 1989). Edelkind says that trial counsel had a duty to object only to mistakes inimical to his client's interest, not to ones that would undermine any verdict against his client. The potential of such errors to undermine the verdict is why an objection is required at the time--not an excuse for failing to make a timely objection.

Edelkind also says that the errors were "structural," requiring reversal without regard to prejudice. "Structural errors" comprise a small category of mistakes so identified by the Supreme Court, but generally exclude erroneous jury instructions (despite the fact that they "preclud[e] the jury from making a finding on the actual element of the offense"). See Neder v. United States, 527 U.S. 1, 9-10 (1999) (collecting examples). The error in Neder itself--the omission of an element of the offense

_____

[3]For example, at the charge conference, defense counsel stated: "And it's the government's view that when a defendant deals with somebody like Fairmont Funding . . . and then they happen to sell their . . . paper to a federally insured bank like Lehman Brothers, that you just assume the risk so-to-speak."

from the instructions--was not deemed structural; mere lack of clarity is clearly a lesser error and not "structural."

To establish "plain" error, Edelkind must show (1) error, (2) plainness, (3) prejudice, and (4) an outcome that is a miscarriage of justice or akin to it. United States v. Olano, 507 U.S. 725, 732-37 (1993). The flaws in the initial instructions and verdict form were error and only partly corrected as to the former; we will assume that any remaining error was plain. The problems for Edelkind are to show prejudice and miscarriage of justice.

The banking institutions defrauded in the first three counts were federally insured. As to count 4, the evidence (discussed below) amply permitted a reasonable jury to find that Lehman Brothers was defrauded. Therefore Edelkind cannot show that the mistakes probably altered the outcome or undermine our confidence in the verdict, United States v. Dominguez Benitez, 542 U.S. 74, 81-82 (2004); Olano, 507 U.S. at 734, let alone constitute a miscarriage of justice.

Turning to the sufficiency of the evidence, Edelkind's attack on this ground is directed only to count 4. The government questions whether his motion for a judgment of acquittal in the district court preserved all of the claims he now makes under this head. Because we find that the evidence was sufficient in each of the aspects raised, we bypass the waiver issue (which poses difficulties of its own).

-11-

Section 1344, as already noted, makes criminal the knowing execution of a scheme to defraud a federally insured bank. See note 1, above. Neither Fairmont nor Aurora was federally insured. Edelkind says that there is no proof that Lehman Brothers, although federally insured, was the intended or direct victim of his scheme to defraud, and therefore the scheme cannot have been one "to defraud a financial institution" as defined by Congress.

The statute says that the scheme to defraud a protected financial institution must be "knowingly" executed. In Brandon, 17 F.3d at 425, this court held that the government does not have to show that the defendant knew which particular bank might be injured or that it was federally insured. Id. at 426. The statute gives fair warning that bank fraud is unlawful: one who defrauds a bank simply assumes the risk that the victim is federally insured. Id.

The greater difficulty, and the main focus of Edelkind's objection, concerns whether Lehman Brothers was in fact defrauded. Edelkind secured the count 4 loan from Fairmont, which was not federally insured. But the government offered evidence that Fairmont did no more than "table fund" the loan, that is, it agreed to make the loan only if another lender first agreed to purchase the loan thereafter. The other lender, on the government's theory, was Lehman Brothers.

Edelkind argues on appeal that Lehman Brothers was not the victim of his scheme to defraud because his fraudulent statements about his wife's credentials and earnings never reached Lehman Brothers; he says the misrepresentations only reached Aurora, Lehman Brothers' non-federally insured subsidiary. So, Edelkind says, he never defrauded Lehman Brothers as section 1344 requires.

Neither the statute nor the case law fully instructs just how tight a factual nexus is required to allow a jury to decide that a scheme, formally aimed at one (uninsured) company, operates in substance to defraud another (insured) entity with whom the defendant has not dealt directly. In our view the statute does apply where the federally insured institution takes part in an integrated transaction and is thereby injured by the defendant, who intended to defraud another party to the transaction. Scienter exists, the causal connection is sufficient, and under Brandon the defendant cannot escape liability by virtue of his ignorance of the overall arrangement.

Here, the government offered evidence that Lehman Brothers' forms and guidelines were used by Fairmont and Aurora in table funding the loan, that a Lehman Brothers official (not just its subsidiary Aurora) signed off on the loan before Fairmont made it, and that Fairmont transferred the loan to Lehman Brothers--not to Aurora--about a month after the closing between Edelkind and

-13-

Fairmont. Thus the loan--although formally made by Fairmont--was from the outset part of an integrated transaction, the first step of which was dependent on approval by Lehman Brothers, and the pre-planned second step of which was a transfer of the mortgage to Lehman Brothers itself.

Given these predicates--Edelkind's intent to defraud, the integrated transaction, and the financial injury to which Lehman Brothers was exposed--the jury was entitled to find that Edelkind defrauded Lehman Brothers, a federally insured bank.[4] The situation would be quite different, and liability might well be doubtful, if the involvement of the federally insured entity was not contemplated at the outset and came about later from a separate transaction, for example, by the happenstance of an insured bank purchasing an earlier loan under-secured because of an earlier, independent fraud. We leave such line-drawing for a case that poses the issue.

We turn now to an ancillary order of forfeiture following the jury verdict. In this criminal proceeding, the government sought forfeiture, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C.A. § 2461(c), of the Hull property used in the scheme and of $579,805.73 in proceeds traceable to the final loan. Edelkind

---

[4]Edelkind says the government offered no proof that Lehman Brothers was federally insured on the day that it took over the Fairmont loan, but Lehman Brothers was insured when it approved the Fairmont loan, thus exposing itself to ultimate loss.

argues that the two forfeiture statutes invoked by the government do not allow this forfeiture to be implemented in a criminal proceeding, but rather only in a separate civil proceeding.[5]

The argument turns upon a difference in the scope of the main federal statutes governing civil and criminal forfeitures, 18 U.S.C. §§ 981, 982, on a bridging statute, 28 U.S.C.A. § 2461(c), and on a related factual premise. The civil forfeiture statute, 18 U.S.C. § 981(a)(1)(C), pertinently subjects to forfeiture any property "which constitutes or is derived from proceeds traceable to" a violation of section 1344; by contrast the criminal forfeiture statute, 18 U.S.C. § 982(a)(2)(B), subjects to forfeiture "any property constituting, or derived from, proceeds the person obtained directly or indirectly, as the result of" such a violation (emphasis added).

Edelkind says that the property forfeited here was obtained by his wife and therefore is not property that he ("the person") ever obtained. Therefore, he concludes, the property was open to a civil forfeiture action but not a criminal one. The government answers by saying that the bridging statute, 28 U.S.C.A. § 2461(c), allowed it to rely upon the civil forfeiture provision

_____

[5]There is good reason to think that Edelkind waived this argument at sentencing. When the judge stated that "there is no legal question that forfeiture will be required. I haven't heard the defense counsel argue to the contrary," defense counsel then replied: "I think we are out of it at this point, Your Honor." No mention was made of the argument now made on appeal. Nonetheless, we reach the merits to resolve the issue definitively.

-15-

in the criminal case. The statute, as it stood between 2000 and 2006, provided (emphasis added):

> If a <u>forfeiture of property is authorized in connection with a violation of an Act of Congress</u>, and any person is charged in an indictment or information with such violation <u>but no specific statutory provision is made for criminal forfeiture upon conviction</u>, the Government may include the forfeiture in the indictment or information in accordance with the Federal Rules of Criminal Procedure, and upon conviction, the court shall order the forfeiture of the property . . . .

Edelkind argues that section 2461(c) does not apply in this case because a "specific statutory provision is made for criminal forfeiture upon conviction," namely, section 982, which expressly applies to violations of the bank fraud statute. The government responds that section 982 was not available in this case on Edelkind's own premise that the forfeited property was not his own, and therefore it could use the bridging statute to enforce section 981 in the criminal case.

Edelkind's best argument is that Congress could not have intended section 2461(c) to apply to offenses for which it deliberately drafted criminal forfeiture provisions narrower in scope than the corresponding civil forfeiture provisions. Otherwise, section 2461(c) would override the extra limitations that Congress imposed in the original criminal forfeiture statute (here, the requirement that the defendant personally obtain the property forfeited criminally).

The government's response is that section 2461(c), as it stood when this case was tried, fills the gap between criminal and civil forfeiture by making criminal forfeiture available in every criminal case that the criminal forfeiture statute does not reach but for which civil forfeiture is legally authorized. On this view, Edelkind's own argument that the criminal statute did not reach the property (because it was not his) shows why the civil statute is available (because the property was traceable to the fraud).

The case law is of little help. Edelkind cites to United States v. Croce, 345 F. Supp. 2d 492, 496 (E.D. Pa. 2004), but it has since been repudiated by the Third Circuit, see United States v. Vampire Nation, 451 F.3d 189, 199 (3d Cir. 2006). United States v. Day, 416 F. Supp. 2d 79, 86 (D.D.C. 2006), followed Croce but United States v. Schlesinger, 396 F. Supp. 2d 267, 275 (S.D.N.Y. 2005), came out the other way.

Neither language nor case law is conclusive, but it seems to us that Congress intended for section 2461 to apply in this situation. This intuition is supported by the legislative history of the bridging statute itself. Far from wanting to limit the substantive reach of the criminal forfeiture statute, Congress made clear in enacting the bridging statute that it hoped to encourage the use of criminal forfeiture procedures, with their greater protections, "whenever any form of forfeiture is otherwise

-17-

authorized by statute."   H.R. Rep. 105-358(I), 1997 WL 677201 at
*35-36 (1997).[6]  Our intuition is further confirmed by Congress'
later amendment that resolves doubts for the future in the
government's favor. See USA PATRIOT Improvement and Authorization
Act of 2005, Pub. L. 109-177, § 410 (2006).

Thus, if Edelkind is right that section 982(a)(2) would
not authorize forfeiture in this case, then "no specific statutory
provision" provided for criminal forfeiture upon his conviction,
and section 2461(c) authorizes the court to apply section
981(a)(1)(C) to fill the gap. If Edelkind's premise is wrong and
section 982(a)(2) would authorize criminal forfeiture in this case,
then section 2461(c) does not apply--but neither has Edelkind been
prejudiced by the government's citation error. See Rule 7(c)(3).

The last issue on this appeal concerns the calculation of
Edelkind's sentence. The sentencing guideline range is driven in
part by the amount of loss resulting from the offense and in part
by other factors. U.S.S.G. §2B1.1(b). Using the 2004 edition of
the guidelines, the district court determined that Edelkind's
violations had inflicted a net loss exceeding $1 million--bringing
the offense level to 23, §2B1.1(a)(1), (b)(1)(I); and that a

---

[6]See also H.R. Rep. 106-1048, 2001 WL 67919 at *61 (2001)
(Congress intended to make criminal forfeiture available "wherever
federal law allows for civil forfeiture of property involved in a
specific crime..."); H.R. Rep. 105-358(I) at *35 (stating that the
purpose of the amendment was to "give the government the option of
pursuing criminal forfeiture as an alternative to civil forfeiture
if civil forfeiture is otherwise authorized.").

further two level enhancement (to 25) was required because--in the words of the guideline--"the defendant derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense."  Id. §2B1.1(b)(13)(A).

At sentencing, the judge proposed to use an offense level of 25, and defense counsel began to argue that the net loss was under $1 million, which would have substantially reduced the offense level; but counsel conceded that if the gross receipts enhancement applied, the language of section 2B1.1(b)(13)(D) prescribed a minimum offense level of 24 regardless of a smaller net loss.  The judge, it appears, adopted this solution, departing downward slightly in the final sentence.[7]

Edelkind does not dispute that he inflicted gross losses in excess of $1 million; but he says that the "gross receipts" enhancement should not have been applied because the gross receipts were derived not by Edelkind, but by his wife--in whose name the Hull property had been acquired and to whom the proceeds of the refinancing loans were directed.   He adds that a prenuptial agreement with his wife provided that property and assets obtained by her were to be and remain her personal property.

---

[7]An adjusted offense level of 24, given Edelkind's criminal history, corresponded to a range of 63 to 78 months.  Because the judge thought that the criminal history points overstated Edelkind's past wrongdoing, the judge departed downward to the 60-month sentence ultimately imposed.

-19-

The district court rejected this argument, reading the guideline to refer not to a defendant's formal legal control of the gross receipts, but instead to his individual culpability.  The district judge stated: "It seems to me that if you procure funds for somebody else and the other person gets the advantage of it, that your moral responsibility is the same whether you take the money or not, particularly if the person you get it for is your wife." We review de novo the meaning of the guideline. See United States v. Alli, 444 F.3d 34, 37 (1st Cir. 2006).

What case law exists largely supports a realistic rather than a formal approach to applying the "gross receipts" enhancement.   Several cases support the enhancement where the wrongfully obtained funds went to a company controlled by the defendant even though the funds were held in the corporation's name.  See United States v. Pendergraph, 388 F.3d 109, 113 (4th Cir. 2004) (defendant had controlling interest in company and "thus controlled the fraudulently acquired funds"); United States v. Stolee, 172 F.3d 630, 631 (8th Cir. 1999) (per curiam) (defendant was "the sole owner and president" of the company); United States v. Bennett, 161 F.3d 171, 192-93 (3d Cir. 1998) (defendant had 100% interest in company). Compare  United States v. Colton, 231 F.3d 890, 911-12 (4th Cir. 2000) (distinguishing non-controlling interest).

To sustain the result in this case, it is enough here to hold that the enhancement is not automatically defeated because formal ownership of the "gross receipts" is in another.  Rather, given its aim, the guideline may be applied where the defendant either controls (even though indirectly) the fraud proceeds attributed to him or where he causes them to be lodged in another with the expectation that he will enjoy the benefits.  Whether any lesser showing would suffice need not be decided.

This reading distinguishes property that goes solely to a co-conspirator and, on the affirmative side, it charges the defendant with proceeds that he controls or enjoys.  Such proceeds can, as a matter of language, be regarded as individually derived by the defendant.  Given the guideline's concern with culpability, this reading makes far more sense than making the guideline turn solely upon formal ownership under state marital or real property law.

United States v. Castellano, 349 F.3d 483, 485-87 (7th Cir. 2003), relied upon by Edelkind, is arguably sound on its own facts and easily distinguishable.  There the defendant had founded the company holding the proceeds but did not own any stock; and only a modest portion ($200,000) of what the fraud netted the company could be traced through to the defendant's compensation. So far as Castellano is read to make state law formalities

-21-

conclusive, it would conflict with the realistic approach taken by other circuits, which we follow here.

The pre-sentence report notes that "[w]ith the borrowed money, Edelkind... financed a lavish lifestyle for himself and his family." Although Edelkind objected to certain details in the report's assertion, the thrust of the report is supported by other evidence and reasonable inference. Thus, the record confirms that Edelkind enjoyed the fruits of the scheme to defraud, and having masterminded the scheme and enjoyed benefits from it, Edelkind himself "derived" the illegal loan proceeds within the terms of the guideline.

Edelkind next says that the $1 million gross receipts figure can be met only if the Fairmont loan proceeds are included--it being the largest of refinancings–and that they should not be included because under section 2B1.1(b)(13)(A) of the guidelines, the receipts exceeding $1 million must be derived "from one or more financial institutions" (emphasis added). As noted, Fairmont was not a financial institution within the meaning of section 1344.

However, the guideline has its own definition of "financial institution" which includes "any state or foreign bank, trust company, credit union, insurance company, investment company, mutual fund, savings (building and loan) association, union or employee pension fund;... and any similar entity, whether or not insured by the federal government." §2B1.1 Application Note 1

(emphasis added). In other words, it is the character of the institution and not federal insurance that matters to the guideline.

Fairmont was described by its witness at trial as "a mortgage bank, mortgage lender" and referred to in its affidavit as a "licensed private mortgage lender." Edelkind offers us no reason to think that Fairmont falls outside the circle of "similar entities," and the case law confirms a broad interpretation. United States v. Ferrarini, 219 F.3d 145, 161 (2d Cir. 2000) ("premium finance company" is within the application note); see also Brandon, 17 F.3d at 426 (using the term "financial institution" colloquially to include uninsured mortgage brokers).

Finally, Edelkind points to an apparent computational error in determining the amount of net loss from his frauds--the figure that drove the initial determination of his offense level (before the gross receipts enhancement). The district court calculated the gross amount of the frauds and then, as the guideline provides, subtracted the present value of the mortgaged Hull property, which remained available to offset the losses. U.S.S.G. §2B1.1 Application Note 3(E).

In calculating the value of the Hull property, the district judge picked a figure between the widely differing estimates offered by the government and by Edelkind. Well after sentencing, it emerged from a newly discovered memorandum that--in

-23-

making his own calculation--the district judge had apparently adopted a final net loss figure $500,000 higher than he had intended. At sentencing, counsel knew the final figure adopted but not the judge's private miscalculation.

The time for correcting the sentence had passed, Fed. R. Crim. P. 35(a), and this appeal had already been lodged with this court. The district judge said at a post-sentencing conference concerning the calculation error that he would leave the matter to this court, which could remand, if necessary. The judge said that he was not prepared to say whether use of the lower net loss figure he had intended would have made any difference to the sentence.

It is clear that the error did not matter. The district court used an offense level of 24 in determining Edelkind's sentence before departing downward. As already explained, the gross receipts enhancement prescribed a minimum offense level of 24 regardless of the net loss. §2B1.1(b)(13)(D). Edelkind concedes in his brief that "[i]f the §2B1.1(b)(13) enhancement applies"--as we have found that it does--"the offense level would rise to 24 in both cases." Thus, the net loss figure, whether in error or not, had no ultimate effect on the sentence.

Affirmed.